Grafton,
May 6, 1902.

### FOWLER *&* *a.* v. KENT *&* *a.*

A covenant personal in its terms is binding upon the heirs and assigns of the covenantor, when such an intention is shown by the language of the deed considered and weighed in the light of the circumstances attending the conveyance, and the practical construction of the language by the parties to the deed and their successors in title.

A deed of the water used by a certain mill conveys a right to draw so much as had theretofore been customarily used in its operation.

A deed of water " for the use of the mill as it now is " limits the amount of water which may be drawn, but not the manner, purpose, or place of its use; and the grantee of such a right may convey a portion of it to one owning water rights in another part of the same privilege.

A covenant to maintain a portion of a dam, for the benefit of all the part owners of a water privilege, runs with the land; and in an action for its breach, all the owners of the servient estate must be joined as parties defendant.

CASE, for a diversion of water from the plaintiffs' mills and for a breach of a covenant to maintain a dam of a certain height. Facts found by a referee, and case transferred from the November term, 1900, of the supreme court by *Wallace*, J., without any order as to judgment.

The Newfound river runs in an easterly direction for a distance in Bristol village. There is a main dam extending from the northerly bank of the river to a point (designated A for convenience of reference) located a short distance from the southerly

bank, and there turning and extending in a southeasterly direc-
tion to the southerly bank at a point about one hundred feet dis-
tant. There is a wing-dam of less height than the main dam,
extending from the latter at a point some eight or ten feet north-
erly of point A in a northeasterly direction about one hundred
feet to the northerly bank of the river. The water privilege at
the northerly end of the main dam is known as the "shoe-factory
privilege"; and the water there used is discharged into the pond
created by the wing-dam (lower pond). The plaintiffs' privilege,
formerly known as the "factory privilege," is on the same side of
the river, near the easterly end of the wing-dam, and takes water
from the lower pond. On the south side of the river there were
formerly two privileges,— one, the "gristmill privilege," located
at the easterly end of the main dam, and the other, the "sawmill
privilege," located a few feet westerly of the former,— both of
which took water from the pond created by the main dam (upper
pond), and discharged it into the river below the wing-dam.
Brackett L. Greenough formerly owned the shoe-factory privilege,
the main dam, and the privileges on the south side of the river;
and Emmons, Lincoln, and Mason owned the factory privilege.
In December, 1832, Greenough leased to Kennedy and his heirs
and assigns, for the term of 999 years, at a nominal rental, the
shoe factory with the right to draw water from the upper pond
for one wheel when the water was not wanted for the use of mills
and machinery then or subsequently operated by water drawn
from other parts of the main dam. A controversy existing between
Greenough and Emmons, Lincoln, and Mason, as to their water
rights, was settled February 25, 1833, and conveyances were exe-
cuted to carry the settlement into effect, as follows: Greenough
quitclaimed to Emmons, Lincoln, and Mason, and their heirs
and assigns, rights accompanied with covenants and agreements
described thus: "all my right, interest, and estate in and
unto . . . the right of holding and continuing their wing-dam,
so called, in Newfound river, running nearly from the factory
owned by us [them] to the mill-dam of said Greenough, of its
present height and construction, and of rebuilding and repairing
the same forever, and I hereby for myself and my heirs and assigns
covenant and agree with the said Emmons, Lincoln, and Mason
and their heirs and assigns that they shall and may hold and con-
tinue the said wing-dam forever without interruption from me or
my heirs or assigns. Also, I agree to keep the dam from the
wing-dam to the southerly bank of said river of sufficient height
to turn the waste water into the factory dam ; and in case water
is needed for the factory, I am to stop the sawmill not to exceed
one month in each year." Emmons, Lincoln, and Mason quit-

claimed to Greenough and his heirs and assigns rights accompanied with covenants and agreements described thus : " all our right, interest, and estate in and unto . . . the right of holding and continuing the mill-dam now owned and occupied by said Greenough across Newfound river in said Bristol above the factory owned by us, of its present height and construction ; and we hereby remise and relinquish to said Greenough and his heirs all right or pretence of right which we have to draw water from said mill-dam, and all rights or pretence of right on our part to have said mill-dam altered or changed in its form or construction, and we hereby covenant and agree for our heirs and assigns that said Greenough and his heirs and assigns shall and may hold and occupy said dam at its present height and construction without any interruption from us or our heirs and assigns, and it is understood that the right of repairing and rebuilding said dam forever is conveyed hereby." The deeds were duly recorded, the first one March 2, 1833, and the other April 25, 1836.

In this way all the water of the river, except that used by Greenough at the gristmill and the sawmill, was turned into the lower pond. From 1833 to 1865 the water rights and rights and obligations as to the dams were conceded, claimed, and enjoyed by the parties and those holding under them in accordance with the above-mentioned settlement ; and the rights of the parties became fixed both by covenant and by prescription.

Daniel B. Bartlett, having become the owner of Greenough's privileges, in 1849 conveyed to Trueworthy G. Currier the gristmill with " the privilege of drawing the water in the same manner it has been accustomed to run, meaning the first right to draw water for the use of the mill as it now is " ; and he conveyed to Favor at the same time the sawmill, " with all the rights of using the water and flowing land which I possess, reserving the right to put in and run a wheel above or below the dam and draw water for the same when it runs over the dam, not interfering with Favor's rights and privileges." Currier was entitled to the use of 980 square inches of water under a twelve-foot head. In the deed to Favor and the subsequent deeds of the sawmill privilege, nothing is said about keeping the main dam between point A and the southerly bank of the river of sufficient height to turn the water into the lower pond, nor about stopping the sawmill one month in a year when the water is needed for the factory privilege. In the deeds from Greenough to his grantee, and from the latter to Daniel B. Bartlett, " any right " conveyed by Greenough to Emmons by deed dated February 25, 1833, is reserved.

In February, 1865, Currier conveyed the gristmill and water rights owned by him to Draper & Berry ; and in March of the

same year they conveyed to Forbes & Cass — then owners of the factory privilege — "all their right and privilege to the waters of Newfound river . . . by virtue of Trueworthy G. Currier's deed to us of his gristmill and privilege . . . over and above three hundred and thirty-six square inches, which we save and reserve to ourselves and our heirs and assigns. The said quantity of water to be drawn by us from the bulkhead, no greater distance from the service than it has been accustomed to be drawn by said Currier, meaning to remise, release, and forever quitclaim to said Forbes & Cass and their heirs and assigns the surplus water more or less connected with and belonging to said gristmill and privilege, above and exceeding three hundred and thirty-six inches, leaving said surplus in said river or pond to the natural flow over the dam and down the bed of the stream, giving them no right to use said surplus water on any land of ours." On the same day, Forbes & Cass conveyed one half of such surplus water to Samuel Page, then owner of the shoe-factory privilege, he agreeing to turn it into the lower pond.

The plaintiffs, by mesne conveyances, have become the owners of the factory privilege and the Forbes & Cass right to the surplus water. The defendants are the owners of the sawmill privilege. The sawmill was customarily run only in the spring and fall seasons, in times of high water, and was required to be shut down when necessary to enable the gristmill to run. The river furnishes sufficient water for all the privileges except in times of low water.

The referee found and ruled that the gristmill and sawmill privileges respectively had the right to the use of water, as had been customary from 1833 to 1865, and that a failure of the gristmill privilege to use all the water belonging to it did not entitle the sawmill privilege to the use of such water, but the same should remain in the river and be allowed to pass over the main dam into the lower pond; that the defendants used more water than they were entitled to, and so wrongfully diverted it from the plaintiffs; and that the defendants have broken the covenant to keep the easterly portion of the main dam beyond point A of sufficient height to turn the surplus water into the lower pond.

*Dearborn & Chase* and *John S. H. Frink*, for the plaintiffs.

*Lewis W. Fling* and *John M. Mitchell*, for the defendants.

CHASE, J. The limitations of the respective rights of the parties to the water-powers created by the main and wing dams largely depend upon the deeds that passed between Greenough and

Emmons, Lincoln, and Mason, in 1833. Before considering these deeds it should be noted that whatever water was used at the shoe-factory privilege necessarily passed into the lower pond, and thereby became available for use at the plaintiffs' privilege. In the view that is taken of the deeds of 1833, it is immaterial whether more or less water was used at the shoe-factory privilege, and consequently no attempt is made to construe the Greenough-Kennedy lease. By the deed to Emmons, Lincoln, and Mason, Greenough conveyed the easement of having and maintaining that portion of the wing-dam that is south of the thread of the stream (*Kent* v. *Taylor*, 64 N. H. 489) upon his land and of flowing the land owned by him situated between the two dams. The deed also contains unambiguous evidence that the parties understood and intended that the "waste water" should be turned into the lower pond for use at the factory privilege. This was to be accomplished by maintaining the easterly end of the main dam of sufficient height for the purpose. In effect, the easterly end of the main dam, maintained at a height sufficient to turn the waste water into the lower pond, was constituted a part of the wing-dam. Whatever right existed to use the "waste water" or any portion of it at the privileges on the south side of the river, together with the right to have the sawmill stopped not exceeding one month in each year if the water was needed at the factory privilege, was conveyed to Emmons, Lincoln, and Mason and their heirs and assigns by means of the estoppel arising from Greenough's agreement. *Burbank* v. *Pillsbury*, 48 N. H. 475, 476; *Foster* v. *Foster*, 62 N. H. 46, 55. Although this agreement when considered by itself seems to be personal, yet when considered in the light of its connections and of the circumstances surrounding the transaction it appears to have been intended to bind Greenough's heirs and assigns as well as himself. The special covenants are expressed in this language: "I hereby for myself and my heirs and assigns covenant and agree with the said Emmons, Lincoln, and Mason and their heirs and assigns that they shall and may hold and continue the said wing-dam forever without interruption from me or my heirs or assigns. Also, I agree to keep the dam from the winged dam to the southerly bank of said river of sufficient height to turn the waste water into the factory [wing] dam; and in case water is needed for the factory, I am to stop the sawmill not to exceed one month in each year." In the first covenant he fully expressed the capacity in which he acted,— "I, . . . for myself and my heirs and assigns." The second covenant is connected with the first by "also," naturally indicating that the pronoun was there used in the same comprehensive sense. The covenantees are not mentioned in the second covenant, but evidently the agree-

ment there stated was with "Emmons, Lincoln, and Mason and their heirs and assigns," the same as the one in the first covenant. Apparently, the scrivener saw no occasion for a repetition of these particulars in the second covenant, following immediately as it does the first, and being connected therewith by a word signifying a continuance of the same general purpose with reference to the extent or duration of the agreement.

A consideration of the surrounding circumstances confirms this view. The deeds were exchanged by the parties in settlement of a controversy respecting their water rights. The factory privilege was dependent upon the use that was made of the main dam. If all the water of the river was diverted to the south side by this dam and there used, the factory privilege would be worthless. The deed from Emmons, Lincoln, and Mason to Greenough shows that the grantors had, or pretended to have, a right to draw water from the main dam, or to have the dam changed in form or construction so that it would allow a larger flow of water to their pond. It does not appear that this right, whatever it was, was limited in duration to the life of Greenough or to the happening of any event. If they had no contractual right in the dam, they, as riparian owners, could require it to be so used as not unreasonably to divert the water of the river from their property, unless they or the prior owners had parted with the right, which is not suggested. It is highly improbable that they would release permanent rights or supposed rights in the main dam in exchange for the right of having the waste water turned into their pond during Greenough's lifetime only. On the other hand, it is reasonable to suppose that the rights, whether actual or pretended, which the parties understood they were exchanging possessed the same quality as to permanency — Greenough acquiring an estate in fee in whatever rights in the main dam were conveyed to him by Emmons, Lincoln, and Mason, and they acquiring a like estate in the right to the waste water the same as to the easement of maintaining the wing-dam and flowing Greenough's land. The right of maintaining the wing-dam would be useless unless there was water to be held back by it; and, so far as appears, after the exchange of the deeds of 1833 the only right Emmons, Lincoln, and Mason had to have water pass from the upper to the lower pond was the right afforded by Greenough's covenant above mentioned.

The contemporary construction of the deeds by the parties and their successors in title furnishes additional, convincing evidence on this point. The case states that, "from 1833 to 1865 the water rights and rights and obligations as to the dams were conceded, claimed, and enjoyed by the parties and those holding under

them in accordance with the above-mentioned settlement." No doubt is entertained that Greenough intended to bind himself, his heirs and assigns, by the second covenant the same as by the first, and that his grantees so understood it; and the deed is construed accordingly. The record of the deed gave subsequent purchasers of rights in the water-power created by these dams notice of the existence of this "waste water" right and its ownership. *Burbank* v. *Pillsbury*, 48 N. H. 475, 477.

By "waste water" the parties evidently meant "all the water of the river except that used by Greenough at the gristmill and sawmill." This is the interpretation that the parties and their successors in title placed upon the words from 1833 to 1865. The use of water at these mills was not unlimited in extent. It was such extent of use as had previously customarily been made; such as was reasonably necessary for the beneficial enjoyment of the mills as they then severally existed. *Dunklee* v. *Railroad*, 24 N. H. 489; *Horne* v. *Hutchins, ante, p.* 117. After the deeds of 1833, Greenough had no right to use more water from the upper pond than was required for the gristmill and sawmill privileges, and of course could convey no such right to others.

When the ownership of the property and water privileges on the south side of the river was severed in 1849 by the deeds of Bartlett to Currier and Bartlett to Favor, there was attached to the gristmill a water right described thus: "the privilege of drawing the water in the same manner it has been accustomed to run, meaning the first right to draw water for the use of the mill as it now is." This language implies that in drawing water it was accustomed to run in a certain manner — that is, through certain orifices, water-wheels, etc., which necessarily would limit the draft and govern the quantity. The same idea is expressed by the words "for the use of the mill as it now is" — the use of water to the extent required by the mill as it then was. This language was used to describe the quantity of water that went with the privilege rather than to limit the manner in which, the purpose for which, or the place at which the water was to be used. If this were doubtful, the very great improbability that the parties would undertake to control the particular devices by which the water should be drawn and the particular uses to which it should be applied would remove the doubt. It would require very explicit language to overcome the natural inference that a person would not accept a deed of a mill privilege subject to the condition that his water rights should become forfeited if any change was made in the manner, purpose, or place of use. *Whittier* v. *Company*, 9 N. H. 454; *Dewey* v. *Williams*, 40 N. H. 222; *Dow* v. *Edes*, 58 N. H. 193; *Fuller* v. *Daniels*, 63 N. H. 395, 397.

Bartlett's deed to Currier estopped him from asserting a right, as riparian owner, to use the water as it passed land retained by him, for it could not be so used without depriving Currier of its use. In fact, Bartlett's water rights had been changed previous to the date of his deeds, from the ordinary rights of a riparian owner upon a river to the rights of an owner in common with others of a mill-pond. He conveyed to Currier, not riparian rights simply, but an interest in riparian rights which pertained to land owned by himself and others and which had previously been converted into a water-power.

It appears that the quantity of water which Currier became entitled to under Bartlett's conveyance was 980 square inches under a twelve-foot head. He acquired the first right to draw this quantity of water from the portion that could be rightfully used on the south side of the river after the delivery of the deeds of 1833. The right was independent of and superior to the water rights conveyed to Favor with the sawmill. Favor's rights were only " the rights of using the water and flowing land " which Bartlett possessed after his conveyance to Currier; and Bartlett reserved a portion of these rights. A failure by Currier to use the water would not give Favor a right to its use, any more than a failure to use the land to which the water right was attached for the time being would give Favor a right to use that. It was immaterial to Favor and Bartlett whether the 980 inches of water were drawn from the easterly end of the main dam or from its northerly end, or whether it ran over the dam into the lower pond. Neither of them could receive any benefit from having it used at the gristmill privilege. It is quite certain that Bartlett had no intention to limit its use to that portion of the dam. See *Whittier* v. *Company, supra.*

Draper & Berry subsequently became the owners of the land and rights conveyed to Currier by Bartlett; and in March, 1865, they conveyed to Forbes & Cass all their water right over and above 336 square inches; that is to say, the first right as against the other owners on the south side of the river to draw 664 square inches of water from the upper pond under a twelve-foot head, or the right to have such water remain in the pond and flow over the main dam into the lower pond. Forbes & Cass conveyed one half of the right thus acquired to Page, subject to an agreement on his part that he would turn the water into the lower pond. The plaintiffs are owners of the factory privilege, the easements and water rights conveyed by Greenough to Emmons, Lincoln, and Mason, and the water rights owned by Forbes & Cass after their conveyance to Page. The referee appears to have found that such was the plaintiffs' title and to have correctly interpreted

the deeds out of which the title arose, and to have based his findings in favor of the plaintiffs upon the count in the writ for a diversion of water upon the above-mentioned findings and interpretation. The plaintiffs are entitled to a judgment upon these findings.

The foregoing questions, or questions in all respects like them, were considered and decided in *Taylor* v. *Blake*, 64 N. H. 392, although it does not so appear in the report of the case. The reserved case (see 159 Briefs and Cases 55) shows that the plaintiffs were tenants of the owner of the property now owned by the plaintiffs in this case, and that the defendant was the owner of a tract of land on the south side of the river above the main dam, together with the water rights reserved by Bartlett in his deed to Favor. The action was case for diverting the water from the plaintiffs' mill. The same deeds and substantially the same facts as in this case were before the trial court, and the finding was as follows: "The plaintiffs have a title and right to the water not customarily used at the Currier and Favor privileges as defined in the deeds of Bartlett in 1849, and to so much of the water from the Currier privilege as was conveyed to Forbes & Cass by Draper & Berry in 1865, and to have the same flow from the main dam. The defendant has the right to the water for one wheel discharging into the wing-dam. His right to water for a wheel below the main dam, if it exists at all, is to obtain the water from the Favor privilege now owned by Kent & Blake. By using the wheel below the main dam while Kent & Blake have used the whole power belonging to the Favor privilege, the defendant has diverted water from the plaintiffs' mills." The defendant excepted to these findings and the verdict thereon, and the exception was overruled by the law court in these words: "The title of the plaintiffs, both by deed and by prescription, to the water diverted from them by the defendant, is quite too plain for discussion." It does not appear whether judgment was entered on the verdict, nor whether the defendants in this action are privy with Blake in that action, and so it cannot be held that the defendants here were estopped from raising the foregoing questions; but if not, the case is a direct authority in favor of the conclusion above reached.

The referee also found that the defendants have broken the covenant in the Greenough deed of 1833 to keep the easterly end of the main dam beyond point A of sufficient height to turn the surplus water into the lower pond. The defendants deny their liability for the breach of this covenant on two grounds: (1) because, as they say, the covenant does not run with any land; and (2) if it does, because the owners of the remainder of the

privileges on the south side of the river are bound by the covenant the same as they, and so an action for its breach cannot be maintained against them alone.

From what has already been shown, it is apparent that the covenant runs with the easement and water rights conveyed by the deed; in fact, the water rights could not be enjoyed without the aid of the covenant. There is a privity of estate between the plaintiffs, as the present owners of the easement and water rights, and the grantees of the Greenough deed. The covenant relates to the maintenance of the easterly portion of the main dam, and its execution is of a continuing nature. As has been seen, Greenough intended to bind his assigns by it, as well as himself. It runs with that portion of the main dam and the water rights dependent upon the maintenance of the same, and binds the successive owners thereof to its performance. The titles of the owners are subject to the burden or incumbrance created by the covenant. *Burbank* v. *Pillsbury*, 48 N. H. 475; *Patten* v. *Patten*, 68 N. H. 603. The first ground upon which the defendants contest their liability upon the covenant is untenable.

It does not appear that the defendants were the sole owners of the easterly portion of the main dam and the water rights maintained by it when the breach of the covenant occurred. If they were not, the plaintiffs could not maintain an action for the breach against them alone; and there should be judgment for the defendants upon this count in the writ. It would seem from the facts reported that they were not sole owners — that the gristmill privilege and perhaps the water rights reserved by Bartlett in his deed to Favor were owned by others. If the defendants owned the main dam, and the privilege of the water held by it for use on the south side of the river was owned by them and others in common, the common owners of the privilege, in the absence of a special agreement among themselves, would probably be under obligation to make the necessary repairs upon the dam in proportion to their respective interests in the privilege. P. S., c. 142, s. 1.

*Case discharged.*

PARSONS, J., did not sit: the others concurred.