165 BROADWAY BUILDING, Inc., v. CITY
INVESTING CO. et al.

No. 291.

Circuit Court of Appeals, Second Circuit.

June 2, 1941.

814

CHASE, Circuit Judge, dissenting.

———◆———

David Barnett, of New York City (Newman & Bisco, of New York City, on the brief), for appellant.

Edward F. Clark, of New York City (Clark & Reynolds and Leonard J. Reynolds, all of New York City, on the brief), for appellee City Investing Co.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

On December 3, 1907, the Interborough Rapid Transit Company, operator of the Sixth Avenue Elevated Railroad in New York City, entered into a formal covenant, which is the subject matter of the controversy herein, with Broadway-Cortlandt Company, the owner of a building then in process of construction, at the southeast corner of Church and Cortlandt Streets and extending through to Broadway, now known as the 165 Broadway Building, in that city. The covenant stated that the owner desired the Railway Company to construct and maintain certain bridges, passageways, and structures as shown on an attached engineers' plan or drawing, providing for a connection between the building and the Company's elevated station on Church Street at Cortlandt Street, and that the company was willing to construct and maintain the same upon the terms and conditions thereinafter set forth. The plan as disclosed called for a corridor or arcade through the building to its west side fronting on Church Street, an opening there with a bridge to the easterly or northbound station platform of the elevated, and an overhead bridge therefrom to the westerly or southbound station platform. The covenanting parties gave easements of use of the premises covering the station and arcade approach for ingress to and egress from the station platforms, and then entered into various agreements concerning upkeep and repair of the structures which necessarily, as all concede, run with the land. The question herein concerns certain promises only, covering refunds of payments made by the owner to the company and to be returned in the event of discontinuance of the structures. Since the City of New York has condemned and removed the elevated railroad, the refunds are due and the question is whether they are personal rights, as contended by appellee (claiming in the right of the original owner) and found by the special master and the court below, or are benefits which run with the land, as claimed by appellant, 165 Broadway Building, Inc., the present owner of the building.

The covenant, signed, sealed, and acknowledged by the parties thereto, contains, in addition to its recitative sections, sixteen formal paragraphs of agreement. The first' two provide for the building of the platforms, bridges, and passageways referred to above, with the owner to pay one-half the cost of the overhead bridge and stairways to the southbound platform and the full cost of the other structures. After several paragraphs of agreement that the owner will procure such grants and licenses as may be necessary from others, that it will construct and maintain a suitable opening in its building, with a corridor or arcade through it as an approach, that it will erect and maintain a ticket office, that the right to maintain the elevated railroad is granted forever, that the company will maintain the structures outside the outer face of the westerly wall of the building and the owner will maintain the part within the building in good condition, and that the company may be excused from performance in the event of court injunction or public prohibition of maintenance of the structures (the owner nevertheless to pay the expenses of construction), we

find the paragraphs most important on the issue herein.

Paragraph ninth states that the company "shall be under no obligation, under any circumstances, to restore or rebuild any wall or other structure of the Owner, or to pay for such restoration or rebuilding" unless the damage was caused by its own negligence. Paragraph tenth gives the company a right of termination of the agreement and removal of the bridges and passageways "upon repayment to the Owner, its successors or assigns," of all amounts paid by the owner "for construction hereunder." [1] And paragraph eleventh provides that the owner shall furnish a ticket agent and ticket office for the sale of tickets, while the company will provide at least one ticket chopper to take the tickets of the elevated patrons; and the owner agrees to pay the sum of $10,000 in cash as and for the cost of providing each ticket chopper required, such amount to be repaid "by the Railway Company to the Owner" upon discontinuance of the railway structure. [2]

Of the remaining provisions, paragraph twelfth states the times when the owner is to make payment of the construction costs, viz., one-half the cost of the overhead bridge and stairways, and the entire cost of all other bridges, passageways, and structures. Thirteen grants the company all necessary rights of access to the ticket office and its maintenance without charge to the company, with the owner agreeing at its own expense to keep the ticket office and corridor in good order and condition and in a good state of repair. Fourteen provides for discontinuance of the connection at the owner's option on twelve months' notice, procurement of releases and grants for a wider stairway and an additional stairway to the street, and payment by the owner to the company of the expense of removal of the connecting bridge and of restoration of the station platform. Fifteen provides that on discontinuance "as herein provided," the owner need no longer maintain the corridor or arcade, or the ticket office, agent, or ticket choppers, but that no other rights "acquired hereunder by" the company or its lessor, "or their successors or assigns," shall be affected by the discontinuance except as therein provided. And the sixteenth or final paragraph states as "agreed by and between the parties hereto that this agreement shall apply to and bind their respective assigns and successors in interest, and all subsequent owners and persons interested in the land affected thereby."

---

[1] "Tenth: Should the Railway Company hereafter make such structural changes in its railway system or in the operation thereof that it will be impracticable to maintain said bridges and passageway, or either, in that event, notwithstanding anything in this agreement contained, the Railway Company shall have the right to remove the same, or either of them, and to terminate all its obligations under this agreement upon repayment to the Owner, its successors or assigns, of all amounts which the said Owner shall have paid to the Railway Company for construction hereunder."

[2] "Eleventh: The Owner hereby agrees to furnish, at its own expense, upon the completion of said bridge and passageway hereinbefore first mentioned, a ticket agent for the sale of tickets to persons desiring to use said elevated railroad, at the ticket office hereinbefore provided for, and to keep and maintain such ticket agent at its own expense daily, except on Sundays and legal holidays other than Saturdays, between 7.00 o'clock A. M. and 7.00 o'clock P. M., as long as this agreement shall continue and to be responsible for the acts of said ticket agent; and the Owner also agrees to pay to the Railway Company, upon the completion of said bridge and passageway hereinbefore first mentioned, the sum of $10,000 in cash as and for the cost of providing one ticket chopper, to take the tickets of persons desiring to use said elevated railroad at the entrance to said bridge from said building; and the Owner further agrees to pay to the Railway Company the additional sum of $10,000 in cash as and for the cost of providing an additional ticket chopper to take said tickets, in case said Railway Company shall at any time deem it necessary to have two ticket choppers stationed at the said bridge upon certificate of the President or Vice-President of the Railway Company that such additional ticket chopper is necessary for the public convenience in using said station.

"In case, however, this agreement shall at any time be terminated and the connection between the building and the railroad structure be discontinued, any sum or sums paid to the Railway Company by the Owner for the maintenance of a ticket chopper or ticket choppers, as hereinbefore provided, shall be repaid by the Railway Company to the Owner, within six months after the termination of this agreement and discontinuance of said connection."

Pursuant to this agreement the owner paid the Railway Company a sum or sums found to be $13,557.15 for construction costs, and also the further sum of $10,000 for one ticket chopper. No other ticket chopper was ever required, and hence no other payments were made. Before the special master the Railway Company claimed that it was excused from making the refund by reason of the owner's default, chiefly in maintaining a ticket office and ticket agent; but the master ruled that it had agreed to or acquiesced in the substitution of McBride's ticket agency, a lessee of corridor space, for a separate office, and it has not appealed. Hence we are concerned only with the transfer of the benefit of the covenant, and not of its burden. It does appear that the City of New York, under the so-called unification agreement, will pay this claim in full for $23,557.15 as soon as the proper payee is determined; but that is under its agreement to assume all liabilities of the company on its purchase of all the assets.

■ In what is now the leading New York case on this subject, Neponsit Property Owners' Ass'n v. Emigrant Industrial Sav. Bank, 278 N.Y. 248, 254, 255, 15 N.E. 2d 793, 795, 118 A.L.R. 973, the present distinguished Chief Judge of the Court of Appeals has stated "the age-old essentials of a real covenant," aside from its form, as intent of the parties that it should run, that it "touches" or "concerns" the land with which it runs, and that there is "privity of estate" between the parties, citing therefor Clark on Covenants and Interests Running with Land, p. 74. It is perhaps a commentary upon the confused state of real covenant law, even as substantially clarified by the Neponsit case, that, while we consider the interesting and substantial question herein as limited to the issue of "touching" and "concerning," nevertheless the master also found a lack of "privity of estate" and appellee urges vigorously that the requisite intent is absent. Since at least on these two latter points we think the result quite clear, we shall consider them first.

■ It is now well settled that no particular formula is necessary for the ex-

pression of intent that a covenant shall "run with land" and pass with the conveyance of an estate therein, so long as the parties have made their desires clear. Denman v. Prince, 40 Barb., N.Y., 213, 217; Murphy v. Kerr, 8 Cir., 5 F.2d 908, 910, 41 A.L.R. 1359; Fowler v. Kent, 71 N.H. 388, 52 A. 554.[3] The parties here made their intent clearly manifest—in paragraph tenth, as to the benefit of repayment of construction costs to the owner, "its successors or assigns"; in paragraph fifteenth, for benefits to the Railway Company or its lessor, or "their successors or assigns"; and finally the complete statement in paragraph sixteenth, covering both benefits and burdens ("apply to and bind"), and with substantially a definition of assigns and successors in interest as "all subsequent owners and persons interested in the land affected thereby." Moreover, the whole tenor of the complete document, with its provisions for maintenance of the arrangement therein provided for inextricably interwoven to make one complete plan or scheme only possible through the running of benefits and burdens, shows an intent for the transfer of such rights and obligations, and no hint of an intent to separate certain promises only for a more limited effect.

■■ As to the requirement of "privity of estate," the master thought that it was lacking because of no conveyance of an interest in the premises between the parties at the time of the making of the covenant. This particular requirement is probably the greatest source of confusion in the subject, because an understandable policy against title encumbrances (carried, however, to an unreal extreme in these days of modern community land developments) has been buttressed by privity doctrines of seemingly authentic, but actually dubious, historicity. That the parties to an action to enforce a covenant, if not themselves makers of the contract, must each have succeeded by privity to the estate of one of such makers is good enough sense; it is why we say a covenant runs with such estate. But to go further and require that there must be some such succession between the covenanting parties themselves—that

[3] True, ancient English law required that the word "assigns" must be used to attach a running obligation to a "thing not in esse," Spencer's Case, 5 Co. 16a, but this formality seems to be gone, too. Sexauer v. Wilson, 136 Iowa 357, 113 N. W. 941, 14 L.R.A.,N.S., 185, 15 Ann.Cas. 54n.; Maher v. Cleveland Union Stockyards Co., 55 Ohio App. 412, 416, 9 N.E. 2d 995, noted in 47 Yale L.J. 821; Denman v. Prince, supra; Clark, Covenants, 74. Here, moreover, the mystic word "assigns" was used.

there must have been a grant or conveyance between them at the time of the covenant or possibly some continuing interest of tenure, easement, or otherwise—is supported neither by ancient land law nor by modern policy. As to the former, the idea goes back no further than a dubious and unsupported statement by Lord Kenyon in Webb v. Russell, 3 T.R. 393, K.B. 1789; as to the latter, it is, at best, only an irresponsible way of eliminating running covenants quite by chance,[4] where the parties have not understood the doctrinal significance of pure form and no conveyancer has warned them of the safeguard to their plans which the mere exchange of cross deeds may afford. Clark, Covenants, ch. 4, pp. 72–117; 32 Yale L. J. 123–145; 3 Tiffany, Real Property, 3d Ed. 1939, § 851; Norcross v. James, 140 Mass. 188, 189, 2 N.E. 946; Holmes, The Common Law, 371–409. That a requirement so anomalous should exist at all is therefore doubtful; the authorities tend to show that, if it is not to be rejected altogether, it is not applicable in any event to the running of the benefit of covenants, as here. Shaber v. St. Paul Water Co., 30 Minn. 179, 14 N.W. 874; Lingle Water Users Ass'n v. Occidental Bldg. & Loan Ass'n, 43 Wyo. 41, 50, 297 P. 385; Murphy v. Kerr, supra; Restatement, Property 2, P.D. No. 27, § 25; Tiffany, op. cit. §§ 849, 851; 47 Yale L.J. 821.

■ But whatever be the correct doctrine, we have here all the requirements which have been enforced under any version of the rule. For, as the cases uniformly hold, the creation or continuance of easements, as here for the use of the premises in question, affords all necessary privity and supports the accompanying covenants. Nye v. Hoyle, 120 N.Y. 195, 203, 24 N.E. 1, 3; Morehouse v. Woodruff, 218 N.Y. 494, 501, 113 N.E. 512; Hazlett v. Sinclair, 76 Ind. 488, 40 Am.Rep. 254; Morse v. Aldrich, 19 Pick., Mass., 449; Tiffany, op.cit. § 853; Clark, Covenants, 96 et seq., 109 et seq.

We turn, therefore, to the final requirement that the promises in question must "touch" or "concern" appellant's real property, the 165 Broadway Building, before appellant can claim their benefit. This question, too, has been the subject of conflicting decisions and learned discourse, as the Neponsit case points out. But

there we have the realistic modern view, at page 258 of 278 N.Y., at page 796 of 15 N.E.2d, 118 A.L.R. 973, that "unless we exalt technical form over substance, the distinction between covenants which run with land and covenants which are personal, must depend upon the effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the land. The problem then is: Does the covenant in purpose and effect substantially alter these rights?" And the learned court considers particularly promises to pay money, stating that, while they may be entirely disconnected with the use of land and hence quite personal, yet a promise to pay for something to be done in connection with the promisor's land does not differ essentially from a promise to do the thing itself. Hence the court, stressing the intent and substantial effect of the promise there in issue—one made to a realty company to pay an annual charge to a property owner's association (a different entity) for the maintenance of roads, paths, parks, beach, sewer, and other public purposes in the area then being developed by the realty company—holds that its burden runs even though it calls for money to be expended on land other than that now owned by the defendant.

We think this poses the problem, as well as affords means for its solution. A promise to refund viewed merely as a promise to pay on condition, i. e., a windfall refund, is personal; while a promise to pay money for land development, or to do something about the land which if the promisor did it in person would clearly benefit such land, may run. Here had the refunds been definitely stated as for the repair and restoration of the building upon the demolition of the elevated station (or as agreements to pay for such restoration not to exceed the amounts originally advanced), there could be no question of the running of the covenant benefits. Our real question is how far such an intent shall be deduced from the circumstances here present.

It may be conceded that prior to the Neponsit case, the general attitude of the New York cases has been one of hostility to running covenants. Certain of the earlier views seem to have been induced by the historical misconceptions above noted;

---

[4] As in Wheeler v. Schad, 7 Nev. 204, where the covenant was too late because

made six days after the deed of conveyance.

and notably in the matter of party-wall agreements, a modification of view has been necessary.[5] Again, following the general English view, the case of Miller v. Clary, 210 N.Y. 127, 103 N.E. 1114, L.R.A.1918E, 222, Ann.Cas.1915B, 872, announced the doctrine that, subject to certain recognized exceptions, the burden of no affirmative covenant should be allowed to run, a view not followed elsewhere in this country. See Murphy v. Kerr, supra; and compare annotations in 41 A.L.R. 1359, 51 A.L.R. 1326, 102 A.L.R. 781, 118 A.L.R. 982. But the Neponsit case demonstrates that the exceptions are broad enough to cover all the more usual cases; indeed, they raise the question whether that rule in practical effect is now more than one of presumption. See 38 Col.L.Rev. 1299; 24 Corn. L. Q. 133; 51 Harv.L.Rev. 320; 50 Yale L.J. 1056, 1065. It is true that there has been hesitation in enforcing promises to pay money as running encumbrances unless a duty to expend for the premises is made quite clear,[6] and this seems still true in the lower courts, even after the Neponsit case.[7] But other cases support burdensome covenants having analogies to the case at bar, as in Lawrence Park Realty Co. v. Crichton, 218 App.Div. 374, 218 N.Y.S. 278, to pay for the cost of roads, cf. 12 Corn. L. Q. 404; Avery v. New York Central & Hudson River R. Co., 106 N.Y. 142, 12 N.E. 619, to provide access to premises for guests at promisee's hotel opposite the premises; or as per Crane, J., in Morgan Lake Co. v. New York, N. H. & H. R. Co., 262 N.Y. 234, 238, 186 N.E. 685, 686, to pay for damages by sparks, ashes, cinders, or coal dust to ice beyond the railroad's right of way, cf. 19 Corn.L.Q. 145. All these, as well as the more usual covenants to repair, Greenfarb v. R. S. K. Realty Corp., 256 N.Y. 130, 175 N.E. 649; Morehouse v. Woodruff, supra, indicate that modern land development cannot be constrained within the narrow limits envisaged by some of the older cases.

We are admonished that we must take state law as it is, not as it may be, Moore v. Illinois Central R. R. Co., 61 S.Ct. 754, 85 L.Ed. ——, a task not without its difficulties where the cases are showing clear progress from authoritarianism to pragmatism. Trying to pin such progress down to a formal rule as of one point of time may well be unfair to the litigants who find themselves in a federal tribunal, as well as inimical, in a small way at least, to the achieving of a sound state doctrine. Cf. Corbin, The Laws of the Several States, 50 Yale L.J. 762. Perhaps the best we can say is that prima facie promises to refund should be considered as not for the benefit of land, but that the Neponsit case warns us to be pragmatic and realistic in looking to the real, rather than the formal, effect of the agreement on the parties' relation to the land and to proper and natural commerce in land.

Thus cautioned, it appears to us that, viewing the agreement as a whole, it

[5] The case of Cole v. Hughes, 54 N.Y. 444, 13 Am.Rep. 611, created great confusion because it condemned the running of burden and of benefit of a rather usual type of agreement to pay for party walls when used. See criticism in McCormick v. Stonehart, Tex.Civ.App., 195 S.W. 883; Clark, Covenants, 140; Walsh, Conditional Estates and Covenants Running with Land, 14 N.Y.U.L.Q.Rev. 162, 167, 168, 180. So in Mott v. Oppenheimer, 135 N.Y. 312, 31 N.E. 1097, 17 L.R.A. 409, such a covenant was allowed to run. Later cases have attempted a reconciliation of these cases on the basis of a somewhat formal rule of intention, that the covenant runs if not made with reference to an existing wall. Crawford v. Krollpfeiffer, 195 N.Y. 185, 88 N.E. 29, 133 Am.St.Rep. 783; cf. the Neponsit case, supra; Clark, op. cit. ch. V; 37 Harv.L.Rev. 760; Aigler, Party Wall Agreements, 10 Mich.L.Rev. 187, 207–209.

[6] Thus, as to covenants to return a deposit for rent, compare Joseph Fallert Brewing Co. v. Blass, 119 App.Div. 53, 103 N.Y.S. 865, and Richards v. Browning, 214 App.Div. 665, 212 N.Y.S. 738, with Moskin v. Goldstein, 225 Mich. 389, 196 N.W. 415, and note criticism in 24 Col.L.Rev. 432. But a covenant to insure has been upheld as a part of the rent, even without an agreement to rebuild. St. Regis Restaurant v. Powers, 219 App. Div. 321, 219 N.Y.S. 684; see cases collected 36 Yale L.J. 1187. Compare generally, Bigelow, The Content of Covenants in Leases, 12 Mich.L.Rev. 639, 30 L.Q.Rev. 319; Aigler, The Content of Covenants in Leases, 17 Mich.L.Rev. 93.

[7] Salvi v. John A. Manning Paper Co., 168 Misc. 661, 7 N.Y.S.2d 36; Nassau County v. Kensington Ass'n, N.Y.Sup., 21 N.Y.S.2d 208; Meado-Lawn Homes, Inc. v. Westchester Lighting Co., 171 Misc. 669, 13 N.Y.S.2d 709, affirmed 259 App.Div. 810, 20 N.Y.S.2d 396; Id., 284 N.Y. 667, 30 N.E.2d 608 (gas charge deposit).

would be unreal to consider these refunds as a windfall payment for the benefit of persons having no present interest in the land, rather than as a component part of a rather carefully thought-out plan of land utilization. The reason and the desire of the building owner here to obtain direct access from its building to a then effective means of transportation are clear and natural. That this arrangement in all its details was a desirable, even a necessary, one for the purpose also seems obvious. It was made for this building; it could not be effected with anything other than this building. The refunding provisions were intimately tied together in the drafting of the agreement with the other running provisions. They seem as intimately tied together in common sense. Thus the company assumed no obligation for repairs and restoration of the premises, thereby avoiding an uncertain and unlimited obligation in the remote future; but it did agree to return the money it had received for the original construction, as well as the subsidy for the ticket chopper. Note that conversely when discontinuance came at the instance of the owner—and obviously the then owner who alone could serve notice of discontinuance —he must pay for such restoration and repair to the company. Here there was no refund to provide a fund, and obviously repair to the platform when the bridge was taken down would be comparatively slight. Mutuality of obligation and of right was secured by the plan (which the parties, as we have seen, conceived of as freely running); it would be destroyed on appellee's contention when the refund goes to a stranger while the owner has to restore its building with a hole in its front and without assistance from anyone.

In this connection the provision as to the ticket chopper is significant, perhaps notably in its arrangement for additional ticket choppers as needed. Had the company required additional choppers after the building had passed from the original owner, obviously the new owner would have been required to furnish the fund to support them. In that event the refund surely should not go to the original owner, but there is no suggestion in the agreement of a distributive refund to different persons who may at some time have held the building. Here again the simplicity of the scheme as the parties intended it contrasts with the unusual results if a harsh and formal rule of restriction is applied. Here no policy favors the restricted view; this is not an encumbrance on title, but a covenant for sensible development of the real estate under the circumstances and in aid of the plan and the easements there created. We think this agreement is within the spirit and letter of the Neponsit rule as a running covenant.

This result makes it unnecessary to consider whether or not the City Investing Company, appellee herein, was entitled to enforce the personal claims of the original owner. Appellee took title to the building in 1914 by a conveyance adequate to carry land encumbrances, but which contained no assignment of personal claims. The Broadway-Cortlandt Company, the original owner, filed a certificate of dissolution in 1933 and its affairs were then wound up. In 1940, after the present controversy had arisen, the directors of the company, acting as trustees, met and authorized, and there was then executed, an assignment of the company's rights herein to the Investing Company, it being stated that this action was confirmatory of the original contract. How far the directors as trustees in dissolution might be authorized thus to make a conveyance which on the face of it at least is without consideration is a question whose solution might well require further investigation; but we need not pursue the matter here.

Appellee has, however, another claim based upon its reservation of refunding rights herein in an unrecorded contract of sale of the building from it to one Benenson, a subsequent taker, of which it claims appellant had notice from the land records. There was such an express reservation in this contract of sale made in 1919, but the conveyance, however, into which it was merged made no reference to the reservation and it never became a matter of record in the land records. The title has since then passed through various hands, including a foreclosure of a consolidated mortgage and a taking of title by the trustee, with eventual conveyance to the present owner. The changes of ownership were so many and so complete that actual notice is hardly possible and is not claimed; indeed, the master would not stop to hear evidence of lack thereof from appellant. The real claim is that a reference in one of the deeds of conveyance that the property was subject to "unre-

corded agreements affecting said real estate" was sufficient to put appellant on notice.

Now, it appears that underlying mortgages, later consolidated and foreclosed, were prior to the deed containing this reference; and hence it seems that appellant may claim a title through such foreclosure superior to this deed. But, be that as it may, the reference is altogether too uncertain to put appellant on notice. If it pointed to anything at all, its natural referent would be the original covenant of December 3, 1907, with its sixteen paragraphs of agreement, which was unrecorded. Moreover, if meticulousness gags at the use of the plural "agreements," it may be noted that that covenant had at least one later modification through the parties' actions, namely, substitution of McBride's ticket agency for the ticket office therein referred to. Certainly the reference is not at all apt to a contract of sale, completed by and merged in an unrestricted conveyance. And the reference is made clear by a contemporary statement in the chain of title, to wit, in the instrument for the consolidation of the mortgages, repeated in certain of the later deeds, that the property was subject to "agreements relating to maintenance of elevated station"—apt reference to the original covenant, but not to the later sale contract. The case relied on by the master, Ebling Brewing Co. v. Gennaro, 189 App.Div. 782, 179 N.Y.S. 384, merely recognizes the general rule that an apt reference to an unrecorded instrument may place a later taker under the duty of inquiry; but then it actually holds that the taker is not responsible for the recitals within the unrecorded instrument itself and thus states a rule more strict than we need assert here. See, also, Acer v. Westcott, 46 N.Y. 384, 7 Am.Rep. 355; Great Southern Land Co. v. Valley Securities Co., 162 Miss. 120, 137 So. 510, 82 A.L.R. 405, with annotation at page 412.

Had notice been shown, there would still have remained the question whether or not a running covenant may be turned into one in gross without the consent of the servient owner. Such a serious change in the nature of the encumbrance has not been recognized with respect to easements and profits, McKenna v. Brooklyn Union Elevated R. Co., 184 N.Y. 391, 77 N.E. 615; McCullough v. Broad Exch. Co., 101 App. Div. 566, 92 N.Y.S. 533, affirmed 184 N.Y. 592, 77 N.E. 1191; 18 Harv.L.Rev. 608; 20 Harv.L.Rev. 136; Clark, Covenants, 69, 70, though the rule seems otherwise as to rents, Demarest v. Willard, 8 Cow., N.Y., 206; Morehouse v. Woodruff, supra; Clark, Covenants, 170. These covenants are so intimately connected with the maintenance and use of the property for the purposes contemplated by the covenanting parties that they would appear more like the easements they accompany than a simple obligation to pay rent. Compare McCullough v. Broad Exch. Co., supra, where the covenants went with the easements.

We conclude, therefore, that appellant herein, as present owner of the premises, is entitled to the repayments in question. The judgment appealed from is reversed so to provide.

CHASE, Circuit Judge, dissents with opinion.

CHASE, Circuit Judge (dissenting).

I cannot agree that the covenants here involved ran with the land now owned by 165 Broadway Building, Inc., though, of course, some which were made at the same time did. We all agree that covenants running with the land must, in the language usually used in that regard, touch or concern it. That is, however, only one way of saying that whenever covenants do not directly or indirectly affect the land they do not run with it.

The original parties to these covenants expressly agreed that the company should be under no obligation, under any circumstances, to restore or rebuild any wall or other structure of the owner or to pay for so doing unless damage was caused by its negligence, and none was so caused. Their agreement also provided that it should apply to and bind "all subsequent owners and persons interested in the land affected hereby". Nor was the company bound to fulfill any covenants which did run with the land if, and after, it elected to make material changes in its line at that point. When such changes were made it was, however, under obligation to pay the sums of money, now in controversy only as to the proper payee, as refunds to the original party, its successors or assigns, of contributions that party had made toward the cost of constructing and operating the elevated railway station. These were merely affirmative personal reimbursement covenants which became effective when the

company of right terminated the covenants which did run with the land. The present owner of the building has, therefore, no right to receive payments made under them. Meado-Lawn Homes, Inc. v. Westchester Lighting Company, 171 Misc. 669, 13 N.Y.S.2d 709; Id., 259 App.Div. 810, 20 N.Y.S.2d 396; Id., 284 N.Y. 667, 30 N.E. 608; Fallert Brewing Co. Ltd. v. Blass, 119 App.Div. 53, 103 N.Y.S. 865.

I dissent.