**FLYING DIAMOND OIL CORPORATION, formerly known as Flying Diamond Corporation, a Utah corporation, Plaintiff and Appellant,**

v.

**NEWTON SHEEP COMPANY, a limited partnership, Ralph M. Newton, Eugene B. Newton and Scott F. Newton, general partners, and Eugene B. Newton, individually, and Edna Elliott Newton, his wife, Defendants and Appellees,**

and

**Bass Enterprises Production Co., a Texas corporation, Intervenor–Defendant and Appellee.**

No. 19178.

Supreme Court of Utah.

May 25, 1989.

Hardin A. Whitney, John W. Horsley, H. Dennis Piercey, Salt Lake City, for Flying Diamond.

William J. Cayias, Salt Lake City, for Newton Sheep.

Keith W. Meade, Claron C. Spencer, Salt Lake City, for Bass Enterprises.

STEWART, Justice:

Flying Diamond Oil Corporation [1] appeals a trial court judgment declaring that, as the surface owner of certain lands, it is entitled to only one-quarter of 2½% payments based on the value of all oil and gas produced from Champlin Petroleum Company's ("Champlin") mineral estate that underlies Flying Diamond's lands. Flying Diamond contends that Champlin's promise to pay the 2½% payment to the surface owner is a covenant that runs with the surface of the land to which Flying Diamond is exclusively entitled. It also asserts that the trial court erred in ruling that Flying Diamond is estopped from claiming more than a one-quarter interest in the 2½% payment.

## I. FACTS

The lands at issue are "railroad" sections that were patented to the Union Pacific Railroad Company. Newton Sheep Company ("Newton") eventually acquired the surface rights from the railroad, and Champlin, a Union Pacific subsidiary, acquired the underlying mineral estate from its parent corporation. Newton also owned both the surface and mineral interests in adjoining nonrailroad lands (the "fee lands").

In September, 1971, Newton's predecessor in interest, Hyrum J. Newton & Sons Sheep Company,[2] and Champlin executed a Surface Owner's Agreement (the "Agreement"), which lies at the heart of this dispute. By section 1 of the Agreement, Newton conveyed to Champlin broad, express rights on the surface of the Newton lands that overlie the Champlin mineral interests. These rights and easements were to enable Champlin and its successors in interest to carry on oil and gas exploration and production:

Land Owner hereby confirms, extends, and grants to Champlin, its agents, lessees, licensees, successors, and assigns, including any operator or unit operator from time to time in charge of operations under a unitization agreement, and their respective successors and assigns, the easements and rights to enter upon the described premises and to drill, construct, maintain and use upon, within, and over said premises all oil wells, gas wells, derricks, machinery, tanks, drips, boilers, engines, pipe, power and telephone lines, roadways, water wells ... and all other structures, [or] equipment ... necessary or convenient in prospecting and developing for, producing, storing, transporting, and marketing oil, gas, and associated liquid hydrocarbon substances under or produced from any portion of the described premises or under or produced from any portion of the unit

1. Flying Diamond has been succeeded in interest by Bow Valley Exploration (U.S.) Inc. Because this action was initiated by Flying Diamond and the parties have referred to the plaintiff as Flying Diamond throughout this case, we continue to refer to the plaintiff as Flying Diamond.

2. Surface title was held by Hyrum J. Newton & Sons Sheep Company. Shortly after execution of the Agreement, which is referred to in the text, Hyrum J. Newton & Sons Sheep Co. transferred its interest to a family limited partnership, the appellee, Newton Sheep Company.

area created under a unitization agreement, together with the right to remove said facilities and the right to use such water as may be needed from the described premises, not including water from Land Owner's wells.

In exchange, Champlin agreed in Section 2 as follows:

[S]o long as it is receiving oil and/or gas production from or oil and/or gas royalties upon production from the described premises or allocated thereto under the provisions of a unitization agreement, to pay or cause to be paid to the Land Owner in cash the value on the premises of two and one-half percent (2½%) of all the oil and gas and associated liquid hydrocarbons hereafter produced, saved, and marketed therefrom or allocated thereto as aforesaid, except oil and gas and associated liquid hydrocarbons used in operations on the premises or used under the unitization agreement. . . .

Section 7 of the agreement states in part:

[T]he covenants to pay the sums provided in Sections 2, 3, and 5 hereof shall be covenants running with the surface ownership of the described premises and shall not be held or transferred separately therefrom, and any sums payable under this agreement shall be paid to the person or persons owning the surface of the described premises as of the date the oil or gas or associated liquid hydrocarbon production is marketed.

Section 8 states:

The easements, rights, and uses herein shall be binding upon the described premises and each and every part thereof, and the present and future owners thereof, and shall continue for the benefit of the present or future owners of the oil and/or gas and/or associated liquid hydrocarbon rights in the described premises and each and every part thereof and their agents, lessees, licensees, successors, and assigns, including any operator or unit operator, and for the benefit of other lands within any unit area within which the described premises, or any portion thereof may be included, and each and every part thereof.

In other sections of the Agreement, Champlin agreed to pay rent based on the agricultural value of any surface area used in unit operations and to pay for damage caused by drilling operations and for certain surface improvements. The Agreement declares that the surface owner has no rights in Champlin's mineral estate.

On February 1, 1972, approximately five months after the Agreement was executed, Newton executed a deed conveying to Bass Enterprises Production Co. ("Bass"), an intervenor-defendant in this lawsuit, an undivided one-half interest in the mineral estate underlying Newton's fee lands (nonrailroad land). The deed also conveyed "[o]ne-half of the royalty (of any type) from production of minerals that the Grantor actually receives, or is entitled to receive until February 1, 2072," from the railroad lands, i.e., those lands to which Newton held only surface title.

Approximately two years later, Flying Diamond sought to purchase all of Newton's remaining mineral interests and payment rights, but Newton refused. On April 12, 1974, however, Newton sold to Flying Diamond, pursuant to a contract called the Newton Ranch Purchase Contract, the entire surface interest, one-half the mineral estate then owned by Newton in the fee lands, and one-half of Newton's interest in the "royalty (of any type)" from the railroad lands. Flying Diamond drafted the Newton Ranch Purchase Contract.

After Flying Diamond's purchase, Champlin discovered oil and gas on several of the railroad sections included in the Agreement. Since that time, Champlin has remitted the 2½% payments required by the Agreement to Flying Diamond. Pursuant to an agreement among Newton, Bass, and Flying Diamond, the latter has deposited three-fourths of the amount of those payments with an escrow agent pending resolution of this case.

Flying Diamond filed a complaint seeking a decree declaring that, as the surface owner of the lands in question, it is entitled to the entire 2½% payment under the Agreement. Newton Sheep Company, its predecessor, the individual partners of the

partnership, and Bass were named defendants. Champlin is not a party to this lawsuit. After a bench trial, the trial court ruled that the Agreement did not prohibit the assignment of the 2½% payment, or any part thereof; that the Newton–Bass deed assigned one-half the 2½% payment to Bass; and that the Newton Ranch Purchase Contract reserved to Newton one-fourth of the 2½% payment. The court held that Flying Diamond owned only the remaining one-fourth interest. It also ruled that Flying Diamond was estopped from claiming a greater interest than its one-fourth interest in the 2½% payment and that Newton and Bass were not estopped by the Agreement from asserting the interests they had in the 2½% payment.

Flying Diamond argues that under the Agreement, the 2½% payment covenant is a covenant that runs with the surface of the land and that since it is the surface owner, it is entitled to the entire amount. Newton and Bass contend that the payment covenant is a personal covenant that is freely assignable. Newton and Bass also argue that Flying Diamond should be estopped from asserting entitlement to the full 2½% payment.[3]

The trial court made no findings specifically addressed to the elements of a covenant running with the land. However, the court did find that the Newton–Bass deed conveyed a one-half interest in the 2½% payment to Bass and that the Newton Ranch Purchase Contract retained in Newton a one-quarter interest in the 2½% payment.

**3.** At trial, Flying Diamond introduced the Agreement and argued that it was dispositive because it created the 2½% payment covenant as a covenant running with the land. Newton and Bass produced witnesses Scott Newton and Ralph Newton, who testified about the Newton–Bass contract, the negotiations with Flying Diamond, and the Newton Ranch Purchase Contract. Both sides also introduced depositions. The depositions of Champlin personnel established the undisputed reasons why Champlin intended the payment provision in the Agreement to be only for the benefit of the owner of the surface of the lands.

**4.** *See supra* note 3.

## II. SCOPE OF APPELLATE REVIEW

■ The findings and conclusions of the trial court do not address specifically the contention that the payment covenant in the Agreement is a covenant running with the land. It is generally the law that the failure of a trial court to make findings on all material issues necessary to support its judgment is an error that usually requires a remand for the purpose of allowing the trial court to make such findings. *See, e.g., Acton v. Deliran,* 737 P.2d 996, 999 (Utah 1987). However, a remand is not necessary if the evidence in the record is undisputed and the appellate court can fairly and properly resolve the case on the record before it. *See Seattle Box Co. v. Industrial Crating and Packing, Inc.,* 756 F.2d 1574, 1578 (Fed.Cir.1985); *Gulf Towing Co. v. Steam Tanker,* 648 F.2d 242, 245 (5th Cir.1981); *LaSalle Extension Univ. v. F.T.C.,* 627 F.2d 481, 485 (D.C.Cir.1980); *King v. C.I.R.,* 458 F.2d 245, 249 (6th Cir. 1972); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2577, at 701 (1971 & Supp.1988). Because the issue of the assignability of the covenant to pay 2½% of the value of production is controlled entirely by the Agreement and the wholly undisputed parol evidence,[4] this Court may properly determine whether the covenant to pay 2½% to the surface owner is a covenant that runs with the land.

## III. COVENANTS RUNNING WITH THE LAND

■ A covenant that runs with the land must have the following characteristics:[5]

**5.** The law of covenants running with the land has long been a source of some confusion. Covenants that run with the land have their roots in English legal history. English courts of law and courts of equity developed somewhat different requirements for covenants that run with the land. As Professor Powell has stated, "Unfortunately, the modern union of law and equity has not yet produced a unified law of covenants." 5 R. Powell, *The Law of Real Property* ¶ 670[2], at 60–12 (1988) [hereafter 5 R. Powell]. One annotation states:

The "spell of the dry grins" which a reference to covenants running with the land provoked in Mr. Justice Holmes may be taken as indicative of that great jurist's fortitude; tears

(1) The covenant must "touch and concern" the land; (2) the covenanting parties must intend the covenant to run with the land; and (3) there must be privity of estate.[6] *E.g., 165 Broadway Bldg., Inc. v. City Investing Co.,* 120 F.2d 813, 816 (2d Cir.), *cert. denied,* 314 U.S. 682, 62 S.Ct. 186, 86 L.Ed. 546 (1941); *Eagle Enterprises, Inc. v. Gross,* 39 N.Y.2d 505, 507, 349 N.E.2d 816, 819, 384 N.Y.S.2d 717, 718 (1976); 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 30, at 600–01 (1965 & Supp. 1989); 5 R. Powell, *The Law of Real Property* ¶ 673[1], at 60–37 (1988) [hereafter 5 R. Powell]. In addition, some courts require the covenant to be in writing. *Chimney Hill Owners' Assoc., Inc. v. Antignani,* 136 Vt. 446, 454–55, 392 A.2d 423, 428 (1978); 5 R. Powell, ¶ 673[1], at 60–38.

Although the touch-and-concern and intent requirements are somewhat interrelated, the absence of any one of the requirements prevents a covenant from running with the land. Berger, *A Policy Analysis of Promises Respecting the Use of Land,* 55 Minn.L.Rev. 167, 219 (1970) [hereafter Berger].

### A. Touch and Concern

■ Not every covenant binds subsequent owners or users of the land, even though the covenant purports to be a covenant that runs with the land. The effect of the touch-and-concern requirement is to restrict the types of duties and liabilities that can burden future ownership of interests in the land. The touch-and-concern requirement focuses on the nature of the burdens and benefits that a covenant creates. What is essential is that the burdens and benefits created must relate to the land and the ownership of an interest in it; the burdens and benefits created are not the personal duties or rights of the parties to a covenant that exist independently from the ownership of an interest in the land. *See* 5 R. Powell, ¶ 673[2][a], at 60–41; Note, *Covenants Running With the Land: Viable Doctrine or Common–Law Relic?,* 7 Hofstra L.Rev. 139, 142, 158 (1978) [hereafter Note, *Covenants Running With the Land*]. In *Neponsit Property Owner's Association v. Emigrant Industrial Savings Bank,* 278 N.Y. 248, 258, 15 N.E.2d 793, 796 (1938), the court stated: "[T]he distinction between covenants which run with land and covenants which are personal, must depend upon the effect of the covenant on the legal rights which otherwise would flow from ownership of land and which are connected with the land. The problem then is: Does the covenant in purpose and effect *substantially* alter these rights?" (Emphasis in original.)[7]

■ Thus, to touch and concern the land, a covenant must bear upon the use and enjoyment of the land and be of the kind that the owner of an estate or interest in land may make because of his ownership right. *See Eagle Enterprises, Inc. v. Gross,* 39 N.Y.2d at 508–10, 349 N.E.2d at 819, 384 N.Y.S.2d at 720; 5 R. Powell,

---

of frustration might be a more characteristic reaction of less Spartan spirits attempting to investigate the subject.
Annotation, *Affirmative Covenants as Running with the Land,* 68 A.L.R.2d 1022, 1023 (1959) (footnote omitted).
    The parent case for covenants running with the land is Spencer's Case, 5 Coke 16a, 77 Eng. Rep. 72 (QB 1583). The progenitor of equitable servitudes is *Tulk v. Moxhay,* 2 Phil. 774, 41 Eng.Rep. 1143 (Ch. 1848).

**6.** For a covenant to run in equity, it must "touch and concern" the land, and there must be an intent that it run. Privity is not required, but the successor must have notice of the covenant. 5 R. Powell, ¶ 673[1], at 60–38.

**7.** Even this formulation, originally propounded in somewhat different form by Professor Bigelow, Bigelow, *The Content of Covenants in Leases,* 12 Mich.L.Rev. 639 (1914), is not entirely satisfactory. In *Neponsit,* the court stated:
    "It has been found impossible to state any absolute tests to determine what covenants touch and concern land and what do not...." Clark, [*Real Covenants and Other Interests Which "Run With Land"* 96 (2d ed. 1947)].
    . . . .
    Even though we accept [the Bigelow] approach and test, it still remains true that whether a particular covenant is sufficiently connected with the use of land to run with the land, must be in many cases a question of degree.
278 N.Y. at 256–58, 15 N.E.2d at 795–96. *See also* Berger, *A Policy Analysis of Promises Respecting the Use of Land,* 55 Minn.L.Rev. 167, 210–11 (1970) [hereafter Berger].

¶ 673[2][a], at 60–41 (citing Bigelow, *The Content of Covenants in Leases*, 12 Mich. L.Rev. 639, 645 (1914)).

The touch-and-concern requirement is critical in distinguishing between real and personal covenants. If the performance of a covenant can be enforced regardless of one's status as owner of an interest in the land, the covenant is personal and, absent other restrictions, assignable. *See Choisser v. Eyman*, 22 Ariz.App. 587, 589–90, 529 P.2d 741, 743–44 (1974). A real covenant bestows a benefit or imposes a burden only on the rights of a landholder, as landholder.

That does not mean, however, that the covenant must have a physical effect on the land. *Leighton v. Leonard*, 22 Wash.App. 136, 139, 589 P.2d 279, 281 (1978) explained: "[T]he test for whether a covenant 'touches and concerns the land' is whether it enhances the land's value [on the benefit side], and for the burden side, whether it diminishes the land's value." Other courts have phrased the matter in a similar fashion. *E.g., Hunt v. DelCollo*, 317 A.2d 545, 549 (Del.Ch.1974) ("[T]he primary consideration in deciding whether a covenant runs with the land is whether it is so related to the land as to enhance its value...."); *Gibson v. Holden*, 115 Ill. 199, 3 N.E. 282, 286 (1885) ("To benefit [the party] as landowner, [the covenant] must,

in some way, affect the value or the use of the land."). *See also 165 Broadway Bldg., Inc.; Neponsit*, 278 N.Y. at 257–58, 15 N.E.2d at 796; *Albright v. Fish*, 136 Vt. 387, 394, 394 A.2d 1117, 1121 (1978).

*First Western Fidelity v. Gibbons and Reed Co.*, 27 Utah 2d 1, 492 P.2d 132 (1971), appears to be at odds with the foregoing paragraph. In *First Western*, this Court held that the parties to an agreement had not intended a covenant to recontour land to run with the land. The Court stated that a covenant running with the land must "have some permanent effect of a physical nature upon the land itself affecting its usefulness and/or its value...." 27 Utah 2d at 4, 492 P.2d at 134.[8] That definition of touch and concern was, however, broadened by a subsequent case. *Lundeberg v. Dastrup*, 28 Utah 2d 28, 497 P.2d 648 (1972), decided a year later, stated that all that must be shown for a covenant to run with the land is that it "be of such character that its performance or nonperformance will so affect the use, value, or enjoyment of the land itself that it must be regarded as an integral part of the property." 28 Utah 2d at 31, 497 P.2d at 650 (footnote omitted). That standard comports with sound policy, in our view, and the approach taken by most courts. *See* C. Clark, *Real Covenants and Other Interests Which "Run With Land"* 96–100 (2d ed. 1947). To the extent that the definition

---

**8.** We note that *First Western* cited the Restatement of Property and *Hudspeth v. Eastern Oregon Land Co.*, 247 Or. 372, 430 P.2d 353 (1967). *See* 27 Utah 2d at 4 n. 2, 492 P.2d at 134 n. 2. Restatement of Property § 543, at 3254 (1944), states:

(1) The benefit of a promise can run with land only if it is a promise respecting the use of land of the beneficiary of the promise.
(2) A promise is a promise respecting the use of land of the beneficiary of the promise if and only if the performance of the promise will

   (a) constitute an advantage in a physical sense to the beneficiary in the use of his land, or

   (b) decrease the commercial competition in his use of it, or

   (c) constitute a return to the beneficiary of the promise for a use of it by the promisor.

*Hudspeth* expressed a reservation that has been widely accepted about this section of the Restatement. *Hudspeth* stated:

We have refrained from resting our decision on the ground that the promise in question does not meet the requirement stated in § 543 because we entertain a grave doubt as to the validity of the requirement. Our doubt springs from the following considerations.

There is nothing in the nature of things which requires the conclusion that the benefit of a covenant is not capable of running with the land unless the performance of the promise will constitute an advantage in a physical sense to the promisee in the use of his land. Both the burden and the benefit of promises in leases have been held to run to the successor of the lessee or the lessor in cases where the promise was not related to the physical use of the land. And certain covenants of title which have no direct relation to the physical use of the land freely run with the land. *Hudspeth*, 247 Or. at 378, 430 P.2d at 356 (footnotes omitted). *See also* Berger, at 213–14.

of touch and concern in *First Western* departs from *Lundeberg,* we disavow the definition in *First Western.*[9]

■ A covenant for the payment of money may at first blush appear to be a personal covenant. *See* Note, *Covenants Running With the Land,* at 164. However, a promise to pay money may touch and concern the land if its purpose is to benefit the covenantor's interest in the land. *See 165 Broadway Bldg.,* 120 F.2d at 817–18; *Neponsit,* 278 N.Y. at 258–60, 15 N.E.2d at 796–97. Clearly, the establishment of an easement may touch and concern the land, *165 Broadway Bldg.,* 120 F.2d at 817, and a covenant to pay for the use of an easement may, in certain circumstances, be part of a covenant running with the land. As stated in Note, *Covenants Running With the Land,* at 164–65: "The promise to pay money is necessarily dependent on the purpose of the payment and thus should not stand alone. Accordingly, most courts have considered promises to pay money in the context of benefit to the covenantor; thus payments for something associated with the covenantor's property have generally been held to touch the land." [10]

■ On that principle, the covenant for a 2½% payment in Section 2 of the Agreement must be viewed in light of the other provisions of the Agreement which create various easements and surface rights in favor of Champlin, the owner of the mineral estate that underlies the surface of the land subject to the Agreement.

Each of the various types of surface rights that the Agreement grants Champlin is designed to facilitate oil and gas exploration and production, and each type of surface right is accompanied by a reciprocal promise by Champlin to pay the surface owner for the use of the surface. For example, Section 3 of the Agreement provides that Champlin is to pay an acreage rental based on the agricultural value of the land actually occupied by drilling operations and storage facilities. Section 5 requires Champlin to compensate the landowner for damage caused by surface operations associated with the extraction of oil or gas. In effect, Champlin's promises to pay the surface owner are compensation for the burdens imposed on the surface operations of the surface owner.

The 2½% payment is also a rough form of compensation, but it is measured and payable only when, and if, there is production. The payments are directly related to the amount of production and roughly proportional to the utilization of the surface easements for production purposes. Furthermore, Champlin's oil and gas rights are subject to a unitization agreement, and the Agreement recognizes that by providing that the easements granted Champlin by Newton may be used for oil and gas operations resulting from production on other lands in the unit.

Instead of entering into the Agreement, Champlin might have chosen to rely instead on an implied-at-law easement over the surface of the land for the extraction of minerals or oil and gas. In *Flying Diamond Corp. v. Rust,* 551 P.2d 509, 511 (Utah 1976), the Court stated:

> The general rule which is approved by all jurisdictions that have considered the matter is that the ownership (or rights of a lessee) of mineral rights in land is dominant over the rights of the owner of the fee to the extent reasonably necessary to extract the minerals therefrom.

---

**9.** Other Utah cases cited by Newton in support of its argument that the covenant fails to meet the requirements of a covenant running with the land have little bearing on this case. None of the cases turns on or analyzes the requirements of a covenant running with the land.

**10.** However, a covenant to pay often does not run with the land even though it arises out of a covenant that does. *Choisser v. Eyman,* 22 Ariz. App. 587, 589, 529 P.2d 741, 743–44 (1974); *City of Douglas v. Cartrett,* 109 Ga.App. 683, 686, 137 S.E.2d 358, 361 (1964); *Pelser v. Gingold,* 214 Minn. 281, 286–87, 8 N.W.2d 36, 39–40 (1943); *Meado–Lawn Homes, Inc. v. Westchester Lighting Co.,* 171 Misc. 669, 671, 13 N.Y.S.2d 709, 711–12 (Sup.Ct.1939), *aff'd,* 259 A.D. 810, 20 N.Y.S.2d 396 (App.Div.), *aff'd,* 284 N.Y. 667, 30 N.E.2d 608 (1940). *Accord Nassau County v. Kensington Ass'n,* 21 N.Y.S.2d 208, 215 (Sup.Ct. 1940) (promise to pay assessments in development held not to touch and concern land because covenant itself did not specify purpose of payments).

(Footnote omitted.) *Accord Appleton v. Kennedy,* 268 F.Supp. 22, 24 (N.D.Okla. 1967); *Callahan v. Martin,* 3 Cal.2d 110, 122, 43 P.2d 788, 794 (1935); *Miller v. Ridgley,* 2 Ill.2d 223, 230, 117 N.E.2d 759, 763 (1954); *Ramey v. Stephney,* 70 Okla. 87, 89, 173 P. 72, 73 (1918); *Ball v. Dillard,* 602 S.W.2d 521, 523 (Tex.1980); 1 H. Williams & C. Meyers, *Oil and Gas Law,* § 218, at 186.42 (1988).

However, an easement implied by law is rather strictly limited to that which is "reasonably necessary" for extracting minerals. *See, e.g., Vest v. Exxon Corp.,* 752 F.2d 959, 961 (5th Cir.1985); 1 H. Williams & C. Meyers, §§ 218, 218.7, 218.9. The reasonableness of a mineral owner's use of the surface is a common source of litigation, since the interests of the surface owner and the mineral owner are often in conflict. *See, e.g.,* Annotation, *What Constitutes Reasonably Necessary Use of the Surface of the Leasehold By a Mineral Owner, Lessee, or Driller Under an Oil and Gas Lease or Drilling Contract,* 53 A.L.R.3d 16 (1973). Champlin was motivated to enter into the Agreement to avoid the frequent conflicts that arise between mineral estate owners and surface owners over use of an implied easement. Certainly the availability of an implied easement did not preclude Champlin from seeking broader, more accommodating surface rights than the law gives by implication.

Thus, Section 1 of the Agreement grants Champlin broad surface rights to facilitate exploration and production. The Agreement grants Champlin a variety of what are in effect "floating easements," and those easements are subject to definition by such unpredictable circumstances as the locations of wells, density of well locations, storage facilities, roads to well sites, and pipelines. The easements come into being as they become "necessary or convenient" for the activities of prospecting for and producing, oil, gas, and liquid hydrocarbons which are under the surface of the land in question and for production occurring on surrounding interests covered by the unitization agreement. The covenant even grants Champlin the right to take water for use in its operation.

The purpose of the payment covenant has special meaning when viewed in light of the breadth and the indefiniteness of the easements. Because of the disruptive potential of Champlin's rights and easements on surface operations, Champlin had a legitimate and well-founded purpose in trying to reduce friction with the surface owner by giving the owner a monetary interest in the success of Champlin's oil and gas operations in the area. Roger Lagerstrom, manager of land surface operations for Champlin's Denver region, testified without contradiction that the purpose of the 2½% payment was to obtain and maintain the good will and cooperation of the landowner and to prevent disputes from arising between the surface owner and the mineral estate owner. In short, Section 2 of the Agreement grants the surface owner ongoing compensation based on production which gives an economic interest to the surface owner that is congruent with that of the mineral estate owner despite otherwise conflicting uses of the land. Thus, the purpose of the payment covenant is to provide more than simple compensation for use of an easement.

The Agreement itself makes clear that the 2½% covenant to pay in Section 2 is tied to the broad and unusual surface rights granted Champlin by Section 1. Section 7 declares:

> [T]he covenants to pay the sums provided in Sections 2, 3, and 5 hereof *shall be covenants running with the surface ownership* of the described premises and *shall not be held or transferred* separately therefrom, and any sums payable under this agreement shall be paid to the person or persons owning the surface of the described premises as of the date the oil or gas or associated liquid hydrocarbon production is marketed.

(Emphasis added.) Section 7 also declares that a subsequent purchaser of the surface estate would be entitled to the 2½% payments only upon a showing of a chain of title of "such ownership." In other words, the 2½% payment was not to be assigned to anyone who was not a surface owner. Section 7 also makes clear that Champlin was

not obligated to pay under Section 2 any person other than "the person or persons owning the surface of the described premises as of the date" of the marketing of the oil and gas.

Section 8 provides that the right to use the surface granted to Champlin by Section 1 is for the development of the oil and gas interests and will pass to successor owners of the mineral estate. That section also declares that the surface easements burden the surface with respect to both "present and future owners" of the surface. It is also significant that each of the payment covenants is written so that the actual amount paid to the surface owner is to some degree commensurate with the extent of use of the surface easements.[11] The 2½% payments would automatically vary in proportion to the value of the production. Presumably, that will have some correlation to the extent the surface is used. The Agreement vests the right to receive payments in the surface owner and no other, since it is that person who must accommodate the mineral estate owner's operations, even if the surface owner is disadvantaged from time to time. The rough matching of the payments to the burdens imposed emphasizes the importance of the intended reciprocal nature of the benefits and the burdens created by the Agreement.

Section 10 of the Agreement also reinforces the mutual dependence of the two covenants and their relationship to the ownership of the surface of the land. Although Section 10 permits both parties to assign the Agreement, *the provision is expressly made "[s]ubject to the provisions of Sections 7 and 9," which provide that the payment covenants run with the land.* Thus, even the general right to assign the entire Agreement, found in Section 10, which Newton and Bass erroneously contend evidences a personal covenant, expressly precludes the separate assignment of the payments apart from the surface ownership and hence negates the notion that the 2½% payment covenant is personal.

In short, we conclude that the payment covenant touches and concerns the land.

## B. Intent of the Parties

▇▇▇▇ Not only must a covenant touch and concern the land, but also the original parties to the covenant must have intended that the covenant run with the land. An express statement in the document creating the covenant that the parties intend to create a covenant running with the land is usually dispositive of the intent issue. The parties' intent may also be implied by the nature of the covenant itself. *Pedro v. Humboldt County,* 217 Cal. 493, 497, 19 P.2d 776, 777 (1933); *Brendonwood Common v. Franklin,* 403 N.E.2d 1136, 1141 (Ind.Ct.App.1980); *Levy v. Graham,* 347 So.2d 1180, 1181 (La.Ct.App.1977); *Reichert v. Weeden,* 190 Mont. 95, 618 P.2d 1216, 1219 (1980).

Under both the express and implied standards, it is clear that the parties intended the covenant to pay 2½% to run with the land. Section 7 of the Agreement specifically declares that the parties intended the covenant to pay to be a covenant that runs with the land. The Agreement then reinforces that point by stating that only those who are owners of the surface of the land are entitled to receive the payments.

No doubt the language in the Agreement is sufficient by itself to establish intent. Nevertheless, we note that Roger Lagerstrom, a Champlin representative, reinforced that which is clear from the Agreement. He testified that the intent of the agreement was "to obtain [the landowners'] cooperation, to keep their goodwill, to prevent any disputes which might arise from uses that someone might consider beyond the scope of our reservation, and to provide a reasonable compensation to the landowner for his cooperation." He also stated that he remembered instances when Union Pacific, Champlin's parent company, "simply made it clear that they

**11.** Trying to predict the exact amount of use that might be made of land not yet drilled was, of course, an impossibility. The payments were not intended to be exactly proportional to the actual use made.

did not recognize retention of rights separate from surface ownership."

Neither Newton nor Bass adduced any contrary evidence as to the intent and purpose of the original parties to the Agreement. Newton's brief simply contradicts that point and argues, without any foundation, that "Champlin has no interest in making the payment to any particular person...." Newton blithely ignores the language in the Agreement which states that *only* the surface owner at the time of production will receive payment under the covenant.

If the covenant were personal and assignable, separate and apart from the land, as the trial court ruled, Champlin would have to pay strangers to the land who have no interest in the surface rights and no power to facilitate and coordinate surface activities to accommodate the production of oil and gas. The power to assign to strangers is the power to nullify the very purpose of the payment covenant.

In sum, the intent of the parties is established explicitly by the Agreement and by the testimony of a Champlin employee.

## C. Privity of Estate

Privity of estate requires a particular kind of relationship between the original covenantor and the covenantee. *H.T. & C. Co. v. Whitehouse*, 47 Utah 323, 329, 154 P. 950, 951 (1916). *See also* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions*, § 33, at 604–05 (1965); Note, *Covenants Running With the Land*, at 144. The types of privity are (1) mutual, i.e., a covenant arising from simultaneous interests in the same land; (2) horizontal, i.e., a covenant created in connection with a conveyance of an estate from one of the parties to another; and (3) vertical, i.e., the devolution of an estate burdened or benefitted by a covenant from an original covenanting party to a successor.[12] *See* Note, *Covenants Running With the Land*, at 144–45; Berger, at 179–207. Mutual privity exists when the parties have a continuing and simultaneous interest in the same property. Note, *Covenants Running With the Land*, at 145; Berger, at 180. Horizontal privity exists when the original covenanting parties create a covenant in connection with a simultaneous conveyance of an estate. 5 R. Powell, ¶ 673[2][c], at 60–61; Berger, at 181.

One writer has stated, "Modern legal writers unanimously favor the abolition of at least mutual and horizontal privity." 5 R. Powell, ¶ 673[2][c], at 60–67. We need not now address the advisability of that approach since privity exists here on traditional grounds.

Newton's grant of the surface easements and rights to Champlin establishes mutuality of estate in the same land between the covenanting parties, Newton and Champlin. *See 165 Broadway Bldg.*, 120 F.2d at 817; *Gilmer v. Mobile & Montgomery Railway Co.*, 79 Ala. 569, 574 (1885); Note, *Covenants Running With the Land*, at 145. Flying Diamond's purchase of the surface title from Newton established vertical privity.[13]

---

**12.** Professor Powell has stated:

[Vertical privity] arises when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened.... Vertical privity exists in all covenant situations except where a successor to the burdened or benefited land is an adverse possessor or a disseisor. 5 R. Powell, ¶ 673[2][c], at 60–64.

**13.** Judge Charles E. Clark, a noted authority on the law of covenants, observed:

[The privity] requirement is probably the greatest source of confusion in the subject, because an understandable policy against title encumbrances (carried, however, to an unreal extreme in these days of modern community land developments) has been buttressed by privity doctrines of seemingly authentic, but actually dubious, historicity. That the parties to an action to enforce a covenant, if not themselves makers of the contract, must each have succeeded by privity to the estate of one of such makers is good enough sense; it is why we say a covenant runs with such estate. But to go further and require that there must be some such succession between the covenanting parties themselves—that there must have been a grant or conveyance between them at the time of the covenant or possibly some continuing interest of tenure, easement, or otherwise—is supported neither by ancient land law nor by modern policy.

*165 Broadway Bldg.*, 120 F.2d at 816–17. We noted earlier that *Neponsit*, 278 N.Y. at 262, 15

*D. Writing*

Finally, for a covenant to run with the land, it must be in writing. Because covenants that run with the land must be based on some interest in land, the statute of frauds must be satisfied.[14] Furthermore, a properly executed and recorded writing also serves the critical and important function of imparting notice to subsequent purchasers. The Agreement was both written and recorded.

In conclusion, the Agreement creates covenants for broad surface rights and easements and a covenant to pay the surface owner 2½% of the value of oil and gas production. Those covenants are closely related and reciprocal, and they run with the land.

### IV. 2½ PERCENT PAYMENT AS ROYALTY INTEREST

Newton and Bass also contend that the 2½% payment is a royalty interest which is separate and independent from the remainder of the Agreement and, therefore, a covenant in gross. Although the 2½% payment is much like a royalty, it is not. A royalty interest is a share of production, "if, as and when there is production, free of the expenses of production." 8 H. Williams & C. Meyers, Oil and Gas Law 862–63 (1987). An oil and gas royalty is an interest in land. *See, e.g., Hardcastle v. McCluskey,* 139 Kan. 757, 758, 33 P.2d 127, 128 (1934); *Williams' Adm'r v. Union Bank & Trust Co.,* 283 Ky. 644, 649, 143 S.W.2d 297, 300 (1940); *Merrill Eng'g Co. v. Capital Nat'l Bank,* 192 Miss. 378, 395, 5 So.2d 666, 670 (1942); *White v. McVey,* 168 Okla. 19, 21, 31 P.2d 850, 852 (1934); *Duquesne Natural Gas Co. v. Fefolt,* 203 Pa.Super. 102, 105, 198 A.2d 608, 610

(1964); *Hager v. Stakes,* 116 Tex. 453, 470–72, 294 S.W. 835, 841–42 (1927).

The 2½% payment does not grant or convey either a share of production or an interest in minerals. The Agreement phrases the 2½% payment covenant in terms of a money payment, and not in terms of creating a share of production or an interest in minerals. As long as Champlin receives oil or gas production from the described premises or from production allocated thereto under the provisions of a unitization agreement, Champlin will pay "to the Land Owner in cash the value ... of two and one-half percent (2½%) of all the oil and gas and associated liquid hydrocarbons hereafter produced...." Furthermore the Agreement specifically states that it shall not be construed as a grant to the surface owner of oil or gas rights. Accordingly, the 2½% payment is not a royalty interest that is freely assignable.

The trial court held that the Agreement did not "prohibit an assignment of an interest in moneys paid by Champlin" and that there was "no express prohibition in the Surface Agreement against an assignment by Newton of an interest in the 2½% payment." Narrowly construed, that statement is correct in the sense that the Agreement does not flatly prohibit *all* assignments. But that statement is patently incorrect insofar as it means that the payments may be assigned to persons who are other than successors to the surface owners, as the trial court ruled. As noted, Section 7 provides that the 2½% payment covenant cannot be held or transferred apart from the surface ownership of the land, and the payments must be made only to the persons owning the surface of the

N.E.2d at 798, abandoned a strict approach to privity doctrine and held that substance should prevail over technical form so that a homeowner's association which had no interest in the property at all could sue to enforce a covenant.

**14.** See generally, Utah Statute of Frauds, Utah Code Ann. § 25–5–1 (1989), which states:

No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surren-

dered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

See also Utah Code Ann. § 57–3–2 (Supp. 1988), which provides that the recording of written instruments affecting real estate imparts notice to all persons of the contents of such documents.

land at the time of the production to which the payment is related. Bass never owned the surface of the land, and the Newtons do not now hold or own any surface rights. Beyond peradventure, they are not entitled, under the Agreement, to any share of the 2½% payments.

## V. DISPOSITION

The trial court ruled, and Newton and Bass assert here, that Flying Diamond is equitably estopped from claiming that it has a mere one-quarter interest in the 2½% payment. The basis of the argument is that Flying Diamond bargained for and acquired in the Newton Ranch Purchase Contract one-half of the mineral estate then owned by Newton in the fee lands and one-half of the "royalty (of any type)" which Newton was entitled to receive from the railroad lands. Newton claims that since Flying Diamond bargained for only a 50% interest in Newton's remaining interest (after Newton's prior conveyance to Bass), Flying Diamond cannot now claim the entire payment.. At first blush, there is merit to Newton's contention. Flying Diamond clearly bargained for and apparently received only a one-half interest in Newton's remaining interest in the 2½% payment, but now, by operation of law, receives the entire 2½%. Thus, both Newton and Bass appear to have lost an interest they had presumably bargained for, and Flying Diamond has acquired an interest that it apparently did not pay for.[15]

Preliminarily, we note the following factors that may bear upon the ultimate disposition of this case. First, there is no assertion that Flying Diamond misled Newton. Second, all parties—Newton, Bass, and Flying Diamond—had either actual or constructive notice of the Agreement, since it was recorded. In fact, both Newton and Bass had actual notice from Champlin, and, of course, the Hyrum J. Newton & Sons Sheep Co. (predecessor of the Newton Sheep Co., a family limited partnership)[16]

had negotiated the Agreement. Newton willingly and knowingly entered into a covenant running with the land. It knew it had done so and was reminded by Champlin of that fact prior to the conveyance to Bass. A December 21, 1971 letter written by Union Pacific, Champlin's parent company, to Newton before conveyance to Bass states:

> [T]he covenants of the Surface Owner's Agreement run with the surface ownership of the described premises. Therefore, if lands under production which are covered by this subject agreement are ever conveyed by Newton Sheep Company, then, of course, Champlin's obligation to pay the 2½% of the value of such production would, upon sufficient notice to Champlin, transfer to the new surface owner.

Bass also knew that the 2½% payment went to the surface owner. An internal Bass letter dated before any conveyance was made stated: *"As long as [the Newtons] own the surface they will receive 2½% in the form of a royalty...."* (Emphasis added.) Thus, neither Newton nor Bass was without actual knowledge of the nature of the payment covenant. Furthermore, since the Agreement was recorded and all parties had constructive notice of the terms of that agreement, they acted at their peril. Thus, neither Bass, Newton, nor Flying Diamond can claim lack of knowledge.

However, of paramount importance is the fact that the covenant in question was created by and for Champlin, a party not before the Court. This Court cannot apply estoppel or any other equitable doctrine or remedy that will prejudice the contract rights of one not before the Court, especially when it appears that of all parties, Champlin is the only one that has clean hands. Thus, estopping Flying Diamond, as surface owner, from claiming the entire payment to do justice to Newton would

---

**15.** At the time the Newton Ranch Purchase Contract was drafted and signed, there was no production; production apparently started in March 1977, almost three years after the contract was executed.

**16.** *See* note 2.

frustrate Champlin's purpose in making the payment.

But if no equitable relief is available to adjust the rights of the parties, Flying Diamond ends up with the entire 2½% payment even though it apparently paid for only a part of it, and Bass and Newton would forfeit entirely their interests.

The author of this opinion believes that the parties should be left to their remedies at law or equity in an independent suit. A majority of the Court, however, believes that fairness to the parties requires that the case be remanded to the trial court to allow the parties to address the issue of what further proceedings should take place in that court consistent with the pleadings and the parties in this case. It may be that after hearing the parties, the trial court will be able to do equity without remitting the parties to whatever rights they have by independent actions.

Reversed with instructions to enter judgment for Flying Diamond under the Agreement and remanded for such further proceedings as may be appropriate in the trial court.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.