2001 UT App 414

**CANYON MEADOWS HOME OWNERS ASSOCIATION, et al., Petitioners,**

v.

**WASATCH COUNTY, et al., Respondents.**

**No. 20000905–CA.**

Court of Appeals of Utah.

Dec. 28, 2001.

Brian K. Haws and Gordon Duval, Duval, Hansen, Witt & Morley, L.L.C., Pleasant Grove, for Petitioners.

Derek Pullan, Heber City, and Blake T. Ostler, Burbidge, Carnahan, Ostler & White, L.L.C., Salt Lake City, for Respondents.

Before JACKSON, Associate P.J., and BILLINGS and DAVIS, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Canyon Meadows Home Owners Association and individual members of the Association (collectively the Association) appeal the district court's order granting summary judgment in favor of New Canyon Meadows, L.C., a limited liability company. The Association argues it was error for the court to rule as a matter of law that language contained within an open space agreement between the Association, Wasatch County, and the original developers of Canyon Meadows did not demonstrate an intention to create an easement that runs with the land. The Association also appeals the court's order grant-

ing Wasatch County's motion to dismiss. We reverse and remand.

## BACKGROUND

¶ 2 The following facts are undisputed. On December 28, 1980, S2–HM Corporation and Hidden Meadows Development Co. (the original developers), Wasatch County, and the Association entered into an open space agreement. This agreement was modified on April 21, 1983, but the language at issue, which we set out below, was retained in the new agreement. The original developers later granted a trust deed in the property that was to be developed, and the bank involved was later placed in receivership. The trust deed passed to the Resolution Trust Corporation and then to the Federal Deposit Insurance Corporation (FDIC). Subsequently, the original developers defaulted and FDIC foreclosed. In July of 1993, FDIC transferred its interest in the Canyon Meadows property to New Canyon Meadows by quitclaim deed.

¶ 3 In July 1999, the Association petitioned the district court for review of the County's decision to form a special service district that impacted upon land that the Association claims title to under the open space agreement. In the same pleading, the Association brought a declaratory judgment action against New Canyon Meadows, Wasatch County, Arden A. Engebretsen, and Arden B. Engebretsen regarding title to the disputed property under chapters 33 and 40 of title 78 of the Utah Code. In August 1999, the County filed a motion to dismiss the petition for review and the declaratory judgment action. The County's motion to dismiss was brought under Rules 12(b)(1) and 12(b)(6) of the Utah Rules of Civil Procedure. The grounds for the motion to dismiss for lack of subject matter jurisdiction were that the petition failed to meet the prerequisites of Utah Code Ann. § 17A–2–1311 (1999). The 12(b)(6) motion was directed at the declarato-

ry judgment action,[1] and the court granted this motion solely with regard to the County—thus dismissing it as a party.

¶ 4 Following this, the remaining respondents also filed a motion to dismiss. That portion of New Canyon Meadows's motion to dismiss dealing with the open space agreement was converted into a motion for summary judgment pursuant to Rule 12(b) of the Utah Rules of Civil Procedure. In September 1999, the Association also moved for summary judgment. A hearing was held in May 2000, and in June 2000, the court granted summary judgment for New Canyon Meadows, ruling as a matter of law that the Association did not have an interest in the disputed land under the open space agreement.[2] The Association appeals.

## ISSUES AND STANDARD OF REVIEW

¶ 5 On appeal, the Association argues that the court erred in ruling as a matter of law that the open space agreement did not create an easement that ran with the land. The Association claims the agreement created an easement that ran with the land as a matter of law. Alternatively, the Association argues that summary judgment was inappropriate because whether the original parties to the open space agreement intended to create an easement that ran with the land presents a factual question that must be resolved at trial.

¶ 6 The Association also argues that it was improper to dismiss the County as a party. The Association claims the County is a necessary party to the proceedings because they have an interest in the outcome.

¶ 7 Whether it was error to grant the County's motion to dismiss is a question of law. See St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 196 (Utah 1991). When reviewing whether a trial court properly granted a Rule 12(b)(6) motion to dismiss, "we accept the factual allegations in

---

**1.** The trial court granted the 12(b)(1) motion to dismiss the petition in its entirety. The Association does not appeal the dismissal of the section 17A–2–1311 petition, and it appears from the record that they stipulated to it. Thus, all that remains before us is the declaratory judgment

action seeking to quiet title to the disputed property in Canyon Meadows.

**2.** The court also granted the motion to dismiss with regard to the Engebretsens; this is not an issue on appeal.

the [petition] as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the [petitioner]." *Id.* Interpretation of easements and restrictive covenants follows the same rules of construction used in interpreting contracts. *See Cecala v. Thorley,* 764 P.2d 643, 644 (Utah Ct.App.1988). Interpretation of contract terms is a question of law. We review a trial court's legal conclusions for correctness. *See Nova Cas. Co. v. Able Constr., Inc.,* 1999 UT 69,¶ 6, 983 P.2d 575.

¶ 8 Summary judgment is proper only when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See SME Indus. v. Thompson, Ventulett, Stainback, & Assocs.,* 2001 UT 54,¶ 9, 28 P.3d 669. In reviewing a grant of summary judgment, this court accords no deference to the trial court's conclusions of law; the trial court's conclusions of law are reviewed for correctness. *See id.* In evaluating whether the trial court was correct in ruling there was no genuine issue of material fact, we view the facts and inferences in a light most favorable to the nonmoving party. *See id.*

### ANALYSIS

¶ 9 We begin by setting forth the language of the open space agreement: [3]

Whereas, it is necessary to *convey* to Wasatch County *an open space easement* covering the minimum area of land that is to be maintained in open space, as a means of insuring that no dwelling or other building or facility, except those approved by the planning commission and County Commission, will be built thereon *during the life of said development,*

Now, therefore, in exchange for the right and privilege of clustering said buildings and structures in locations and areas which have been designated on the said Master Plan on file with the intent that such areas and locations be deleted and excluded from this Open Space Agreement.

The developer and owners of said land, for themselves and *for their successors, lenders and assigns,* hereby agree: 1) to transfer to the Homeowners Association any area of the open space which is shown in the Master Plan as Common Area which shall not be less than 50% of the total area described in Exhibit "A" and which is included in any stage of development, such transfer to be made when the final map is recorded on such stage of development; and 2) to refrain from constructing any dwelling, or other building or facility, except those approved by the planning commission and the County Commission upon the land designated in the open space shown in the Master Plan, *unless this agreement has been duly terminated by the action of the County Commission ....* Accordingly, the undersigned owners of the subject land hereby *grant an open space easement* as is described in the Development Code of Wasatch County dated June 23, 1979, in and to that certain land [described in attachments].

(Emphasis added.) There is no dispute that the land at issue in this action is the land described in the modified 1983 agreement.

¶ 10 In its motion for summary judgment, New Canyon Meadows argued that the words "successors, lenders, and assigns" did not include it because it did not take the land subject to any agreement to be bound as such.[4] The Association's main contention to counter this argument is that the original parties intended to create an easement that would run with the land, and thus, when New Canyon Meadows took the quitclaim deed from the FDIC, New Canyon Meadows took the land subject to the easement created by the open space agreement. The Association argues that New Canyon Meadows had notice of the easement because it was recorded in the Wasatch County Recorder's Office.

---

3. This language is identical in both the 1980 and 1983 agreements.

4. In its brief to this court, New Canyon Meadows asserts that the doctrine of changed circumstances makes enforcement of the terms of the agreement against them inequitable. The trial court did not address this in its order. Moreover, questions about the relative inequities borne by the parties tend to be intensely fact specific and can be best addressed on remand.

¶ 11 In its order granting New Canyon Meadows summary judgment, the court ruled that New Canyon Meadows was not a successor, lender or assign of the original developer because "[m]ere conveyance of real property by quitclaim deed does not create an assignment or successor-in-interest relationship," and there was never any express assignment from the original developers to New Canyon Meadows.

¶ 12 The court next considered whether the agreement was a "restrictive covenant" that ran with the land, and would therefore be binding on any subsequent purchaser.[5] In doing so, the court looked to the Utah Supreme Court's decision in *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618 (Utah 1989), in which the court set out four requirements for a covenant to run with the land: (1) the covenant must touch and concern the land, (2) the covenanting parties must intend the covenant to run with the land, (3) there must be privity of estate, and (4) the agreement must be in writing. *See id.* at 623. The trial court ruled that the open space agreement satisfied three of the four requirements, but the fourth, whether the parties intended the covenant to run with the land, was not satisfied, and the agreement was not binding on New Canyon Meadows.[6]

¶ 13 In reaching this conclusion, the court looked to the language of the agreement and determined that the intent of the original parties was not clearly expressed. The court then relied upon *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d at 198, for the proposition that in order to imply a restrictive covenant, "the support for it must be 'plain and unmistakable' or it must be 'necessary' as a matter of law." *Id.* (citation omitted). The court then reasoned that if the agreement was capable of two competing constructions, it was bound to adopt the one that least restricted the free use of land.[7] The court noted that the parties could have easily included the phrase "run with the land" if they had so intended and ruled as a matter of law that the original parties had not intended that the restrictive covenant run with the land.

¶ 14 On appeal, the Association argues that the trial court erred in granting summary judgment for New Canyon Meadows because more than one reasonable interpretation of the language at issue is possible, and therefore, whether the original parties to the agreement intended an easement that would run with the land is a question of fact inappropriate for resolution by summary judgment.

¶ 15 In support of its argument that the original parties intended to create an ease-

---

5. The trial court referred to the issue as being whether the agreement created a restrictive covenant that runs with the land, otherwise known as a real covenant. Restrictive covenants can also create mere personal rights. The Association refers to the creation of an easement. The agreement, if it creates an easement, would create a negative easement, and the terms negative easement and restrictive covenant are often used interchangeably. *See* Restatement (Third) of Property: Servitudes § 1.2 (2000). A servitude can be appurtenant (attached to the land), in gross or personal. *See id.* § 1.5 & cmt. a. The open space agreement could also be categorized as creating a conservation easement. *See id.* § 1.6. Typically, at common law, conservation easements were in gross and did not run with the land. Recent state statutes modeled on the Uniform Conservation Easement Act have made these easements assignable. *See id.* § 1.6 cmt. a; 4 Richard R. Powell, *Powell on Real Property* § 34A.01 at 34A–6 to –7 (Michael Allan Wolf ed., 2001); *see also* Utah Code Ann. §§ 57–18–1 to –7 (2000). The Association points to sections 57–18–1 through 57–18–7 in its brief, but those sections

of the code were enacted after the agreement in question was signed; thus we do not consider the effect of sections 57–18–1 through 57–18–7 in this case. Whether the agreement creates a negative easement or a restrictive covenant, the issue is still whether it was intended to run with the land.

6. Neither New Canyon Meadows nor the County challenge the court's determination that the first three elements were met; thus, this is not an open question on remand.

7. The trial court's reliance on *St. Benedict's* is misplaced. In that case, there was no express restrictive covenant or easement written into the contract between the parties, and the covenant had to be implied out of thin air. *See St. Benedict's*, 811 P.2d at 197–98. Here, we have an express written negative easement or restrictive covenant, and the question is only what the parties intended by it; thus, the rule from *St. Benedict's* dealing with implying a covenant is inapplicable.

ment that would run with the land, the Association points out that the terms "successors" and "assigns" have long been used to create easements that run with the land. *See* 9 Richard R. Powell, *Powell on Real Property* § 60.04[3][b] at 60–50 to –52 (Michael Allan Wolf ed., 2001); *cf. Flying Diamond,* 776 P.2d at 620. Professor Powell notes that the word "assigns" has been used to create a covenant that would bind subsequent owners since *Spencer's Case,* 77 Eng. Rep. 72 (Q.B. 1583). We note that the agreement also contains the words "grant" and "convey," which are "traditionally the appropriate word[s] used for the creation of an easement" and are still commonly used today. 4 Powell, *supra* § 34.04[4] at 34–27.

¶ 16 The Association also points to the underlying purpose of the agreement as support for its contention that the agreement was intended to create an easement that would run with the land. *See* 9 Powell, *supra* § 60.04[3][b] at 60–50 to –51 (stating the focus in determining whether a covenant was intended to run with the land is on the subjective state of mind of the original parties, and that the intent is generally gleaned from "the language of their transaction, read in light of the circumstances of its formulation"). Here, according to the Association, the underlying purpose of the agreement was to create open space that would last the lifetime of the Canyon Meadows development. Indeed, the Association points out that such a provision was necessary in order to satisfy the County's requirements for such developments. The Association argues that in order to achieve these purposes, the original parties to the agreement must have intended an easement that would run with the land. Otherwise, if, as New Canyon Meadows argues, the agreement is simply a contract binding only its signatories and the express successors and assigns of the contract, the very purpose of the agreement—to create and keep open space for the life of the development—could be defeated by simply

conveying the property to an entity not a party to the agreement.[8] According to the Association, these circumstances surrounding the drafting of the agreement support its contention that the intent of the original parties was to create an easement that would run with the land.

¶ 17 In *Flying Diamond,* the court looked to the underlying purposes of the agreement between the original parties in order to support its conclusion that the easement was intended to run with the land. 776 P.2d at 627–28. In that case, the court determined that the original parties had intended that the royalty payment go to the person that the mining company would be dealing with on a regular basis—the surface rights holder. The *Flying Diamond* court ascertained that the easement in question was intended to run with the land, in part, from the fact that part of the reason for entering the agreement in the first place was so that the normal tensions between holders of surface rights and mineral rights would be eased by compensating the surface rights holders based on a percentage of oil and gas extracted. *See id.* at 626–28.

¶ 18 We see a parallel here. As urged by the Association, it would make little sense to agree to an open space agreement that was to last "the life of said development" if, in fact, the rights created were merely personal and did not run with the land. The open space agreement contemplates a grant of an easement to the Association in exchange for "the right and privilege of clustering" other buildings on the remaining land. If all that was intended was a temporary set-aside of open space, then the County could have simply given the original developers a variance from their regulations and there would have been no need to convey an easement to the Association.

¶ 19 According to Powell, factors strongly favoring a construction that a covenant was

---

8. It is interesting to note that situations like this in nineteenth century England gave rise to the equitable rule of *Tulk v. Moxhay,* 41 Eng. Rep. 1143 (Ch. 1848), where the Chancery Court held that even if a covenant did not run with the land as required at common law, it would still be enforced on a subsequent purchaser who took with notice because it would be inequitable to allow the original party burdened by the covenant to escape liability by mere conveyance to a third party with notice. *See also* 9 Powell, *supra* § 60.01[4] at 60–7 to –8 (discussing *Tulk v. Moxhay* and the development of equitable servitudes).

intended to run with the land include: (1) the retention of adjacent land by the grantor, (2) the retained land is benefitted by the agreement, and (3) "the establishment of a common plan of development which includes land retained by the grantor." 9 Powell, *supra* § 60.04[3][b] at 60–54 to –55. A situation where the arrangement is of a permanent nature and is made against a "background of a common plan of development" favors an interpretation that the burden shall run with the land. *Id.* From the limited record we have before us on summary judgment, it appears that all of these factors are met here.

¶ 20 Based on the need to accept all facts and inferences in favor of the nonmoving party, as we must in reviewing a grant of summary judgment, we conclude that the trial court erred in granting summary judgment for New Canyon Meadows. Considering the language of the agreement and the underlying purpose of the agreement, as urged by the Association, it was error to rule as a matter of law that the easement or covenant was not intended to run with the land. Although we express no opinion on the ultimate ability of the Association to produce enough evidence to convince a factfinder of its position, the Association has done enough to raise a genuine issue of material fact concerning the original parties' intent.

¶ 21 This case presents a procedural situation closely analogous to that in *SME Industries*. In *SME Industries,* the trial court granted summary judgment for the defendants, ruling as a matter of law that a contractual clause prohibiting assignment of any "interest" in an agreement also prohibited the assignment of any cause of action arising as a result of a breach. 2001 UT 54 at ¶ 8, 28 P.3d 669. Our supreme court reversed, holding that whether the original contracting parties intended to bar assignment of a cause of action was a fact question to be determined at trial. *See id.* at ¶¶ 14–15, 28 P.3d 669. In doing so, the supreme court noted that both parties had presented contrary but plausible interpretations of the language at issue. The court stated it was unclear from the language itself exactly what the original parties to the agreement had intended. The court then ruled that consideration of extrinsic evidence was necessary to determine the meaning of the language in the agreement. *See id.*

¶ 22 The same holds true here. The explanations of the meaning of the language at issue in the agreement offered by both parties are plausible. If the agreement had contained the words "run with the land," then the Association's assertions would be bolstered. Nevertheless, the failure to include these specific words does not defeat their claim as a matter of law.

¶ 23 On remand, there is another issue that the trial court should address. The language in the agreement giving the County the right to terminate creates an ambiguity in the agreement. New Canyon Meadows argues that this right to terminate goes to the entire agreement, and at oral argument, the County agreed with this interpretation. However, it is also possible to read this language as modifying only part two of the agreement, rather than giving the County the ability to terminate the entire agreement.

¶ 24 New Canyon Meadows argues that if the County can unilaterally terminate its own rights *and* those of the Association, then this shows that the original parties did not intend to create an easement that would run with the land. New Canyon Meadows argues that giving the County the right to wholly terminate the agreement demonstrates that there was no intent to grant an indefeasible property interest. The Association argues that any person or entity that holds the dominant interest can unilaterally terminate its own interest, and that the ability of the County to terminate its own interest does not mean that the easement was not intended to run with the land.

¶ 25 These arguments were not adequately presented or considered at the summary judgment hearing. On remand, the meaning of this language must be determined. If the trial court finds that this language is also ambiguous, that there are two plausible explanations for its meaning, and that there are disputed issues of fact on this issue, then determining the meaning of the termination clause would not be suitable for summary judgment and instead should be an issue for

trial. What bearing this provision of the agreement has on the ultimate issue of the intent of the original parties to the agreement is also an issue for resolution on remand. If it is determined that the County can terminate both its rights and those of the Association, the court must also determine what legal effect this has on the agreement as a whole.

¶ 26 Finally, we address the Association's argument that the trial court erred in granting the County's motion to dismiss. At the May 2000 hearing, the County advised the court that it would be "bound by the judgment" even if it were dismissed as a party. "We concede that the order can say Wasatch County is bound by the agreement." The County repeats this assertion in its brief on appeal. The Association argues it was error to dismiss the County because Rule 19 of the Utah Rules of Civil Procedure and Utah Code Ann. § 78-33-11 (1996) require joinder where a party has an "interest" that may be impaired by the litigation.

¶ 27 In *PGM, Inc. v. Westchester Investment Partners, Ltd.*, 2000 UT App 20, 995 P.2d 1252, we reversed the trial court's ruling that PGM was bound by an order entered in Westchester's favor in another case because PGM had not been a named party in that litigation. *See id.* at ¶.1, 995 P.2d 1252. Notwithstanding the County's offer to be "bound" by the ruling regarding the open space agreement, we fail to see how the Association could hope to enforce any order against the County if the County is not a named party.

¶ 28 Moreover, our invitation for the trial court to address the termination clause contained within the agreement does implicate an interest of the County. The County contended at oral argument that the termination clause relates to the entire agreement, and if it chooses, it may terminate the entire agreement unilaterally. Because construction of the language of the termination clause, and its effect on the meaning of the agreement as a whole, will be addressed on remand, we conclude, pursuant to Rule 19 and section 78-33-11, the County has a sufficient interest in the litigation to justify their presence as a named party, and there is a "genuine justici-able controversy" between the Association and the County. *Salt Lake County v. Salt Lake City*, 570 P.2d 119, 121 (Utah 1977).

## CONCLUSION

¶ 29 We conclude that the Association is entitled to a trial on the issue of the original parties' intent relative to the scope of the open space agreement. We remand for trial the issue of whether the original parties to the agreement intended an easement or covenant that would run with the land. We conclude that whether or not the County can unilaterally terminate the entire agreement is a factor to consider in making this determination, and we remand construction of this portion of the agreement to the trial court. We also conclude that the County must remain a named party in this action, but may elect the degree to which it will participate in the trial.

¶ 30 Reversed and remanded.

¶ 31 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.